**UNITED STATES of America, For the Use and Benefit of Irving WOLTHER, Plaintiff,**

v.

**SEACOAST REPAIR CO., Inc., Defendant.**

**The HOME INDEMNITY COMPANY, Defendant and Third-Party Plaintiff,**

v.

**NEW HAMPSHIRE FIRE INSURANCE COMPANY and Charter Electric Co., Inc., Third-Party Defendant.**

**Civ. A. No. 16718.**

United States District Court
E. D. New York.
Jan. 17, 1957.

Leonard Feldman, New York City, for plaintiff.

Edwin R. Wolff, New York City, for defendant and third-party plaintiff.

David Halper, Brooklyn, N. Y., for third-party defendant New Hampshire Fire Ins. Co.

GALSTON, District Judge.

This is a motion by beneficiary-plaintiff, Irving Wolther, for an order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., for summary judgment against defendant, The Home Indemnity Company.

The complaint, filed on July 12, 1956, alleges that the action is brought under Section 270b of Title 40, U.S.C.A., for $22,080, which plaintiff claims he is entitled to by virtue of material and labor furnished by Charter Electric Co., Inc., plaintiff's alleged assignor, to and on U.S.N.S. Lt. James Robinson, a vessel of the United States Government.

According to the complaint, defendant Seacoast Repair Co., Inc., entered into a contract with the Government on or about June 21, 1955, for general repairs on the Robinson. It then alleges that at the same time defendant, Home Indemnity, issued a payment-bond accepted by the Government, guaranteeing payment of labor and material to those persons who furnished labor and material on and to said vessel on behalf of Seacoast, in the amount of $49,833. It further alleges that between June 22, 1955 and July 20, 1955, Charter Electric Co., Inc., as Seacoast's subcontractor, furnished certain of the labor and material for the Robinson under the aforesaid contract of repair in the amount of $22,080. It is then alleged that Charter duly assigned the said indebtedness to plaintiff, Wolther, due demand for payment, nonpayment

thereof, and that there remains due and owing to the United States for the use and benefit of Wolther the sum as yet unpaid totalling $22,080.

The complaint also alleges that one year has not expired since the date of final settlement of the contract in question between the Government and Seacoast. It also recites upon information and belief that on January 11, 1956, Seacoast filed a petition in bankruptcy under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq., and that said Seacoast is insolvent and without sufficient assets to meet the claims of its creditors.

In its answer, defendant, Home Indemnity, denies that the reasonable value of the labor and material furnished by Charter amounted to $22,080; that Charter assigned over to the plaintiff the said indebtedness; that due demand for payment was made upon Seacoast and that there is due and owing from Home Indemnity to plaintiff, Wolther, the amount of $22,080. The answer also denies knowledge that the complaint was filed within one year since the date of final settlement of the contract, and that Charter, as subcontractor of Seacoast, furnished labor and material on the Robinson.

The answer also sets up a "Fourth Defense, Set-Off and Counterclaim" and a "Fifth Defense, Set-Off and Counterclaim."

The Fourth Defense alleges that on or about July 7, 1955, Charter received from Seacoast checks in the amount of $4,755 and $6,000, which were applied by Charter for work done by Charter on the Government vessels, Golden Eagle and Kelley, respectively. It further alleges that these moneys obtained and received by Charter from Seacoast came out of a fund of $41,755.68 paid to Seacoast by the Government for repairs made on the vessel Robinson; that at the time of these payments Charter should have known, or had reason to believe that the said payments were made out of funds derived by Seacoast for work performed on the Robinson, and

that Charter improperly and invalidly credited said sums for work done on the Golden Eagle and Kelley. The Fourth Defense also alleges that the New Hampshire Fire Insurance Company had issued payment bonds, accepted by the Government, guaranteeing to subcontractors of Seacoast payment for labor and materials supplied by them on and to the Golden Eagle and Kelley, and that Home Indemnity was under no liability for the payment of labor and materials claims of sub-contractors on said vessels.

The Fifth Defense alleges in substance that on or about July 14, 1955, Charter received from Seacoast the sum of $4,000 which Charter knew or ought to have known was part of a fund of $34,449.48 received by Seacoast from the Government for repairs made on the Gen. H. F. Hodges, and that Charter improperly and invalidly credited the aforesaid $4,000 to moneys owing by Seacoast for work done by Charter on the Kelley. It also alleges that at the request of Seacoast, a corporation other than Charter furnished labor and materials for the General Hodges, whereas Charter had furnished labor and materials for the Kelley. It also alleges that the payment bond guaranteeing payment for labor and materials for the General Hodges was issued by defendant, Home Indemnity, and that the payment bond in connection with the Kelley was furnished by New Hampshire Fire Insurance Company.

It thus appears from the allegations of the Fourth and Fifth Defense that it is defendant Home Indemnity's claim that the sum of $14,755 was misapplied by Charter, and that by reason of the wrongful diversion, defendant, Home Indemnity, is entitled to set off the $14,755 against the claim of the plaintiff.

Defendant, Home Indemnity, has filed a third-party complaint against New Hampshire Fire Insurance Company and Charter Electric Co., Inc., alleging, in substance, that by virtue of the misapplication by Seacoast and Charter of the sum of $14,755, referred to above, to labor and materials furnished by Charter

for the three vessels, Golden Eagle, Kelley and General Hodges, upon which New Hampshire was surety, the said New Hampshire and Charter are liable to Home Indemnity for said amount.

Affidavits have been submitted in support of and in opposition to the motion for summary judgment. The reply affidavit of Charles C. Zimring, President of Charter Electric Co., Inc., in support of the motion, avers that at no time did Seacoast, either directly or indirectly, indicate to Charter the source of any funds used for the purpose of making payments due Charter for labor and materials furnished by Charter to Seacoast in connection with any of the vessels referred to in the pleadings. The affidavit of Edwin R. Wolff, attorney for Home Indemnity, though, in opposition to the motion, states that Charles C. Zimring did know at the time of the receipt of funds from Seacoast in the amount of $6,000 and $4,755 on July 7, 1955, that the payments were being made out of funds received by Seacoast from the Government for work done on the Robinson.

Rule 56(e) of the Federal Rules provides as follows:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

The averments in the Wolff affidavit with respect to knowledge on the part of Charles C. Zimring and Charter of the source of funds out of which Seacoast made payments to Charter are based upon "information and belief," and upon statements made by a third party to the deponent not within the presence of the plaintiff.

However, subsequent to the hearing on this motion, on application to this court, defendant was granted leave to submit an answering affidavit to the reply affidavit of Charles C. Zimring. The affidavit of Anthony Vitiello, President of Seacoast Repair Co., Inc., has been submitted by defendant. The Vitiello affidavit states in part:

"On or about July 6th, 1955, Seacoast owed money to Charter for work done by Charter on the vessels "Kelley", "Golden Eagle" and "Robinson." At that time Seacoast had on deposit in the First National City Bank in Brooklyn, its only bank account, a balance of less than $300.00. On or about July 7th, 1955, Seacoast received in the mail from the Government a check for $41,755.68, which check was deposited in the said First National City Bank.

"On or about July 7th, 1955 said Mr. Zimring called me on the phone at my office and told me I was receiving a check in a large amount for work done on the vessel "Robinson" and that he was coming over to my office to obtain payments from me.

"On or about July 8th, 1955 said Mr. Zimring in person called at my said office and at that time I, in the presence of Miss Dorothy Griffin, my bookkeeper, told Mr. Zimring that I had received a check for over $40,000.00 for work done by Seacoast on the vessel "Robinson" from the Government, and said Mr. Zimring wanted me to pay him about $15,000.00. However, I told him that I couldn't give him that much money, but I would give him as much as I reasonably could, because I had other people to pay. He then asked me to 'square off' the account on the vessel 'Golden Eagle' and give him a partial payment on the vessel 'Kelley' out of the money that I received. I thereupon instructed my said bookkeeper, Miss Griffin, to take out the bills to find out how much Seacoast owed on the 'Kelley' so that we could pay him on the 'Kelley' and how much Seacoast owed on the 'Golden Eagle' so that we could pay him for work done on that vessel.

"I believe that Seacoast owed a balance of $4,755.00 on the 'Golden

Eagle' and Miss Griffin drew a check to the order of Charter for that amount, which Mr. Zimring said he would apply as a payment for work done by Charter on the 'Golden Eagle', and I also had Miss Griffin draw another check for $6,000.00 to the order of Charter, which Mr. Zimring said he would apply for work done by Charter on the vessel 'Kelley'.

"On or about July 7th, 1955, Seacoast owed Charter for work done on the 'Robinson' approximately $22,000.00, * * *."

With respect to the check for $4,000, alleged in the answer to have been misapplied by Charter, the Vitiello affidavit avers that on or about July 14, 1955, there were telephone conversations between Vitiello and Zimring about Seacoast's receiving a check from the Government for work done on the General Hodges. The affidavit then states:

"Mr. Zimring then came over to my office, as I recall, and I had my said bookkeeper draw a check for $4,000. on or about July 14th, 1955, to the order of Charter, which said Mr. Zimring stated he was going to apply to the 'Kelley' account, and that is exactly what he did. He applied it to the 'Kelley' account, although he knew and I told him that it came out of 'Hodges' money."

So the Zimring affidavit and the opposing Vitiello affidavit raise an issue of fact as to whether Charles C. Zimring and Charter had knowledge of the source of funds received by Charter as alleged in the pleadings.

The present action is brought by plaintiff, as the assignee of Charter. There is no showing in the affidavits submitted in opposition to the motion that plaintiff ever had knowledge of the source of funds from which payments allegedly were made to Charles C. Zimring, President of the assignor company. In this connection the Vitiello affidavit states as follows:

"I was never told by Mr. Wolther to make out checks for monies which Seacoast owed to Charter, to the order of Irving Wolther. I was never told by said Mr Zimring to make out checks to said Irving Wolther. * * *.

"It is true that Seacoast and I received a letter from Irving Wolther on May 16th, 1955, in which Mr. Wolther stated that he was appointed factor for Charter and in which he requested that all future remittances be made directly to his office. It is also true that in that letter there is a postscript to the effect that the 'Kelley' account had been assigned to Irving Wolther, but I, individually or as President of Seacoast do not remember that either Seacoast or I received any notice from Irving Wolther that monies due on the 'Robinson' to Charter has been assigned to Irving Wolther.

"It is entirely possible that the original or a copy of said Exhibit '3' dated July 11th, 1955 might have been transmitted either by Charter or by Wolther to Seacoast, but that document is dated three days after the aforesaid payments of $6,000. and $4,755. were made to Charter by Seacoast by checks signed by me on behalf of Seacoast."

The Exhibit 3 referred to is attached to the Wolther affidavit and is a copy of what is described in the affidavit as "the instrument of assignment" setting forth the "specific fact of assignment" of the Robinson account. It is dated July 11th, 1955, and states as the amount due for "Seacoast Repair" on the "USNS 'Robinson'" as $22,080. It then states:

"For value received pursuant to agreement dated December 1, 1947, the undersigned hereby assigns to Irving Wolther of New York City, all monies due or to become due to the undersigned in connection with the above job or jobs. Checks received in payment of these accounts will be

delivered to Irving Wolther at 860 Grand Concourse, Bronx 51, N. Y.

Charter Electric Co., Inc.
(Signed) Charles C. Zimring
Charles C. Zimring, President"

It should be noted that the "Invoice Date" for the Robinson account is given in Exhibit 3 as "7/7/55".

There is also attached to the Wolther affidavit, as Exhibit 2, a copy of the invoice rendered by Charter to Seacoast, dated July 7, 1955, in the amount of $22,-080. There is typed across the face thereof the following statement:

"This invoice assigned and payable to:
Irving Wolther
860 Grand Concourse
Bronx 51, N. Y."

The motion papers do not indicate how and when the above invoice was delivered to Seacoast.

A copy of the agreement, dated December 1, 1947, referred to above, is attached to the Wolther affidavit as Exhibit 1. Upon examination of its provisions, it appears that the instrument is not a general assignment but rather an agreement that Wolther, the plaintiff herein, "will * * * have assigned and purchase" accounts receivable and other choses in action from Charter. It provides that Charter "will provide the Second Party (Wolther) with an assignment satisfactory to the Second Party of such receivables purchased." With respect to the collection of the assigned accounts receivable, Paragraph 3 of the agreement provides:

"3. That, subject to the provisions of paragraph 4, First Party (Charter) shall be privileged to collect for Second Party any purchased accounts receivable, but such privilege may be terminated by Second Party at any time, in its discretion, * * *."

Paragraph 4 of the agreement provides, in part:

"4. The credit and collection services of the Second Party are to be available to the First Party, but in order to expedite collection of assigned receivables, the First Party shall endeavor in the first instance to make collections of assigned receivables for the Second Party."

█ It appears, therefore, that notice of the assignment of the Robinson account was not received by Seacoast until after it had paid the three checks in question to Charter, the assignor. Moreover, it is clear that no notice or request that remittances on the Robinson account be made directly to the assignee, was received by Seacoast before the said checks were paid over to Charter. There is attached, as Exhibit 7, to the Zimring affidavit, a copy of a letter, dated May 16, 1955 from Irving Wolther to Seacoast Repair Company, Inc. The letter advises that Wolther had been appointed factor for Charter Electric Co., Inc. and requests that all future remittances be sent directly to Wolther. On that date, May 16th, of course, the Robinson account had not been assigned to Wolther. From the foregoing, with respect to the payments alleged to have been misapplied, Charter can be regarded as having received the checks in question for and on behalf of its assignee, Wolther, and as his agent. Therefore, knowledge as to the source of funds from which payments were received on the part of the assignor-agent is material, even though the assignee had no knowledge.

The plaintiff contends that in the absence of any direction on the part of Seacoast to apply funds paid to any particular account, Charter was justified in applying the payments received as it saw fit. He also contends that no showing has been made that Charter knew the source of the funds from which Seacoast made payments. The cases cited in support of the foregoing arguments appear to deal with instances where the creditor had no knowledge of the source of funds out of which the payments were made. As noted herein, in the instant case the Vitiello affidavit states that the president of Charter was aware of the fact that

payments made to him came out of funds received for work done on the Robinson. It may be noted that from the averments of the Vitiello affidavit it is evident that Vitiello knew that Zimring, on behalf of Charter, intended to apply money received from Seacoast to the accounts on the Golden Eagle and Kelley, although he was told the funds were for work done on the Robinson. Similarly, it appears that Vitiello was aware of Zimring's intention to apply money alleged to have been received for work done on the General Hodges on the Kelley account. It also appears from the Vitiello affidavit that he raised no objection to the intended application by Zimring of the payments. On the contrary, it seems that Vitiello drew the checks for $4,755 and for $6,000 as payment on the Golden Eagle and Kelley accounts, respectively.

In United States for Use and Benefit of Crane & Co. v. Johnson, Smathers & Rollins, 4 Cir., 67 F.2d 121, at page 123, the court set forth the following rule:

"* * * when a surety is bound on one of several debts of the principal debtor to a creditor, and a payment is made by the debtor to the creditor with the identical money for the payment of which the surety is bound, or with the proceeds or fruits of the very contract, business, or transaction covered by the obligation of the surety, the application of the payment to some other debt, *with or without the direction or consent of the debtor*, does not bind the surety; *at least if the source of the funds is known to the creditor or person receiving the payment*. The surety in such case is entitled to have the payment applied to the debt for which he is bound." (Emphasis supplied.)

See also R. P. Farnsworth & Co. v. Electrical Supply Co., 5 Cir., 112 F.2d 150, 130 A.L.R. 192, rehearing denied, 5 Cir., 113 F.2d 111, certiorari denied 311 U.S. 700, 61 S.Ct. 139, 85 L.Ed. 454; Section 388, Restatement of Contracts.

In view of the foregoing it must be concluded that the issue of knowledge on the part of Charter, plaintiff's assignor, of the source of funds out of which payments were made is a material fact in the case.

In addition to the foregoing, it is noted that Section 270b of 40 U.S.C.A. provides, in part, as follows:

"* * * but no such suit shall be commenced after the expiration of one year after the date of final settlement of such contract."

■ The words "final settlement" in the statute have been construed as meaning the administrative determination by the officer in charge of the execution of work that it has been performed, and his finally fixing the amount due. Illinois Surety Co. v. United States to Use of Peeler, 240 U.S. 214, 36 S.Ct. 321, 60 L.Ed. 609; Globe Indemnity Co. v. United States to Use of Steacy-Schmidt Mfg. Co., Inc., 291 U.S. 476, 54 S.Ct. 499, 78 L.Ed. 924. Plaintiff, therefore, in order to be entitled to recover herein, must prove that his action is timely.

■ The complaint alleges one year has not expired since the date of final settlement. The answer denies any information as to the truth of this allegation. The motion papers are silent in respect to the date of final settlement. Therefore, there exists a genuine issue on the material facts to show whether this fundamental jurisdictional requirement has been satisfied.

In view of the foregoing the motion for a summary judgment is denied.

Settle order.