HYOSUNG AMERICA, INC. and Hyosung America, Inc. as Assignee of Orkid Tex, Inc., Plaintiffs,

v.

SUMAGH TEXTILE CO., LTD., Defendant.

No. 94 Civ. 0568 (SAS).

United States District Court, S.D. New York.

April 19, 1996.

Harlan M. Lazarus, Lazarus & Lazarus, P.C., New York City and Matthew Gluck, Fried Frank Harris Shriver & Jacobson, New York City, for plaintiffs.

Steven C. Bennett, Fredrick E. Sherman, Jones, Day, Reavis & Pogue, New York City, for defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge:

Sumagh Textile Co., Ltd. ("Sumagh") moves for summary judgment seeking dismissal of the amended complaint filed by Hyosung America, Inc. ("Hyosung"). The complaint pleads nine causes of action, including claims arising from and relating to Sumagh's alleged breach of warranty, breach of contract, fraud, violation of both the Lanham Act and the Wool Products Labeling Act, and claims for compensatory and punitive damages. Hyosung alleges that Orkid Tex, Inc. ("Orkid") ordered fabric from Sumagh that was to contain 65% rayon and 35% wool but that, contrary to the supply orders, the fabric Sumagh supplied contained no more than 30% wool. Thereafter, Orkid assigned its rights and interests in the underlying contracts to Hyosung.

For the reasons stated below, Sumagh's motion is granted. Hyosung's amended complaint is this matter is thus hereby dismissed.

### I. Facts

#### A. Agreement Between Hyosung and Orkid

On January 24, 1991, Hyosung entered into an agreement ("Agreement") with Orkid which provided that Orkid would "obtain and assign to [Hyosung] purchase orders from customers" for textile goods, and "shall arrange to purchase Goods from [Orkid's] various suppliers." Defendant's Local Rule 3(g) Statement ("Def. 3(g)") ¶¶ 1–3.[1] Under the Agreement, Orkid submitted customer purchase orders to Hyosung and one of Hyosung's factors for review. Id. ¶ 4. Each purchase order was "subject to full credit approval" of the factor as well as subject to Hyosung's "satisfaction, in its discretion, with

---

1. Plaintiff has admitted 130 of the 137 paragraphs of Defendant's 3(g) statement. The Defendant's 3(g) has been used to cite only those admitted propositions.

the terms of the transaction." *Id.* ¶ 5. Once Hyosung was provided with "all details of the purchase," Hyosung arranged to open a letter of credit for the benefit of the supplier of the goods in order. to fill the customer's purchase order. *Id.* ¶¶ 6–7.

When the goods were shipped, Hyosung cleared them through Customs and arranged to ship them to the customer. *Id.* ¶ 8. Hyosung then collected payment for the shipment from the customer, and subsequently remitted payment to Orkid, minus various charges. *Id.* ¶ 9. If "for any reason" Hyosung did not receive payment of the customer's purchase order in full—such as because of "merchandise disputes"—Hyosung could withhold payment to Orkid. *Id.* ¶ 10. Orkid retained the responsibility for "obtaining any required import or export licenses for the Products and for compliance with all laws and regulations governing the sale, purchase or use of the products." *Id.* ¶ 11. Any cancellation of a customer's purchase order "whether before or after production ha[d] been completed or before or after delivery of shipment to the Customers" was Orkid's "total responsibility." *Id.* ¶ 12. The Agreement was never terminated, and thus governed the fabric sales at issue in this action. *Id.* ¶ 15.

### B. *Orkid Makes a Deal with San Moire*

Sometime in late 1992 or early 1993, Mervyn's, a department store chain, placed an order with San Moire, Inc. ("San Moire") for garments made of rayon/wool fabric. Def. 3(g) ¶ 65. San Moire had discussions with Orkid regarding rayon/wool fabric which San Moire needed to produce garments for Mervyn's. *Id.* ¶ 67. After providing Orkid with a sample of the type of fabric it wanted, San Moire placed a series of purchase orders with Orkid for production of the fabric. *Id.* ¶¶ 68–69. Specifically, San Moire requested fabric consisting of 65% rayon and 35% wool. *Id.* ¶ 70.

In February and March 1993, Sumagh sent Orkid a series of memoranda, referring to a range of qualities and prices for rayon/wool fabric that Sumagh could provide to Orkid. Eventually, Sumagh agreed to provide fabric to Orkid.

In June 1993, Orkid made the first delivery of fabric to San Moire, which San Moire accepted.[2] *Id.* ¶ 109. San Moire, in turn, sent sample garments to Mervyn's, to which Mervyn's did not object. *Id.* ¶ 110. In a memorandum to Sumagh dated July 27, 1993, Orkid confirmed that it was satisfied with the quality of rayon/wool fabric that Sumagh had been shipping, noting: "We don't care wear (sic) you get the ... goods from as long as its the same quality that you been shipping." *Id.* ¶¶ 111–12.

### · C. *The San Moire Deal Goes Bad*

But the deal soon soured. On September 30, 1993, San Moire sent a letter to Hyosung and Orkid, which stated: "There is a problem with the content of the Rayon Wool goods purchased. All payments of invoices for the Rayon Wool fabrics will not be paid until the problem is resolved." Def. 3(g) ¶ 113.

On October 4, 1993, Mervyn's sent a letter to San Moire, in which it rejected "the entire shipment of rayon/wool merchandise" sent by San Moire. *Id.* ¶ 114. Mervyn's stated that it was rejecting the goods because "Mervyn's purchase order required that the fabric content of the merchandise be 65% rayon and 35% wool," that the fabric content varied from that amount, and that "no fabric content tolerance is allowed." *Id.* ¶ 115. After October 4, 1993, San Moire continued to cut rayon/wool fabric received from Orkid into garments. *Id.* ¶ 116. Although San Moire never returned any of the rayon/wool fabric, it refused to pay Hyosung for some of the fabric. *Id.* ¶ 117.

· Prior to the commencement of this action, Orkid "assigned all of its rights, title and interests for and to the various contracts at issue herein with Sumagh [t]o Hyosung." *Id.* ¶ 137 (citing Declaration of Frederick E. Sherman, dated Oct. 2, 1995, Exhibit 25, ¶ 1).

### II. *Procedural History*

On October 18, 1994, Hyosung filed a complaint against San Moire in New York State Supreme Court. Def. 3(g) ¶ 118. Hyosung

---

**2.** Pursuant to the Agreement, Hyosung shipped the fabric for Orkid to San Moire. San Moire

was apparently aware of this arrangement prior to the receipt of the merchandise.

alleged that it delivered rayon/wool fabric to San Moire, that San Moire had a reasonable opportunity to inspect it and did not reject it, and that San Moire wrongly refused to pay for the fabric. *Id.* ¶¶ 121–23. Hyosung sought damages of $556,199.25, the amount of the unpaid fabric invoices. *Id.* ¶¶ 124–25. Hyosung and San Moire eventually settled this claim for $180,000. *Id.* ¶¶ 126–27. After $130,000 had been paid to Hyosung pursuant to the Stipulation of Settlement, San Moire advised Hyosung that it would liquidate its remaining assets; the "residual" claim of $50,000 was then settled for $25,000. Affidavit of J.R. Cho, Vice President of Hyosung, dated October 26, 1995, ¶¶ 5–6.

On November 9, 1994, Hyosung filed a complaint against Orkid in New York State Supreme Court. Def. 3(g) ¶ 128. In its complaint, Hyosung alleged that Orkid authorized Sumagh to manufacture rayon/wool textile fabric with a fiber content of "less than 35% wool and greater than 65% rayon." Hyosung later sought a default judgment. *Id.* ¶ 133. There is no indication in the record as to whether a default judgment was entered.

Hyosung commenced this action against Sumagh on January 31, 1994, seeking damages of "not less than" $600,000. Am.Cplt. ¶ 68.

### III. *Standard for Summary Judgment*

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 1). The court's function on a summary judgment motion is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994). Thus, "[a] court may not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and that the moving party is entitled to judgment as a

matter of law." Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of showing the absence of a genuine factual dispute. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In deciding a summary judgment motion, the court should resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Brady v. Town of Colchester,* 863 F.2d 205, 210–11 (2d Cir.1988). Finally, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

### IV. *Analysis*

#### A. *Arguments Advanced by Sumagh*

Defendant argues that it is entitled to judgment as a matter of law on several grounds. First, Defendant notes the familiar principle that the knowledge of both agents and assignors are imputed, as a matter of law, to their principals and assignees, respectively. As Orkid was aware that the fiber content of the rayon/wool fabric ordered from Sumagh was not 65% rayon and 35% wool, Sumagh argues that it is therefore entitled to summary judgment because a principal/agent relationship existed between Hyosung and Orkid, and Orkid's knowledge of the actual fiber content of the fabric must be imputed to Hyosung. Second, Sumagh argues that it is entitled to summary judgment because as Orkid's assignor, Hyosung "stands in the shoes" of Orkid, and is charged with Orkid's knowledge.

Alternatively, Defendant argues that should this Court deny its request for summary judgment *in toto,* it is nevertheless entitled to judgment on several individual claims. First, Defendant argues that because Hyosung had access to (yet failed to make use of) critical information—the details

surrounding the purchase—it is barred from asserting that it relied to its detriment on Sumagh's alleged misrepresentations when issuing the letter of credit. Second, Sumagh argues that Hyosung's ninth, alternative cause of action must be dismissed because it is "inconsistent" with the rest of its response to the summary judgment motion.[3] Finally, Defendant argues that in any event, Hyosung's claim under the Wool Products Labeling Act must be dismissed because the Act does not allow for a private right of action.

After reviewing the briefs, depositions and documentary evidence[4] submitted in support of and in opposition to the motion for summary judgment, I conclude that summary judgment dismissing the entire complaint is warranted. Those claims arising solely from Orkid's relationship with Sumagh, and later assigned to Hyosung, are dismissed due to the assignor/assignee relationship between Hyosung and Orkid.[5] Additionally, Hyosung's claim under the Wool Products Labeling Act is dismissed as the Act does not permit a private right of action.[6] Hyosung's Lanham Act claim is also dismissed for failing to allege any possibility of consumer confusion. Finally, the claim of fraud in causing Hyosung to obtain a letter of credit is also dismissed. Finally, I rule that Hyosung does not have a viable claim under the Lanham Act, 15 U.S.C. § 1125.

### B. The Principal/Agent Relationship

An agency relationship is typically established by "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Itel Containers Int'l Corp. v. Atlanttrafik Express Service Ltd.*, 909 F.2d 698, 702 (2d Cir.1990) (quoting *Restatement (Second) of Agency* § 26 (1958)). The elements of an agency relationship are: (1) "a manifestation by the principal that the agent shall act for him," (2) "accept[ance of] the undertaking" by the agent, and (3) "an understanding between the parties that the principal is to be in control of the undertaking." *In re Rubin Bros. Footwear, Inc.*, 119 B.R. 416, 422 (S.D.N.Y.1990). Of these, the critical element is control of the agent by the principal. *In re Shulman Transp. Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir.1984).

The import of finding that an agency relationship exists between two parties is that the knowledge of an agent must be imputed to its principal. *See Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 50 N.Y.2d 31, 43, 427 N.Y.S.2d 961, 405 N.E.2d 205 (1980) (noting "general" rule of "imputation of knowledge from agent to principal"); *City of New York v. Lead Industries Assoc., Inc.*, 190 A.D.2d 173, 178, 597 N.Y.S.2d 698 (1st Dep't 1993) (principal is "chargeable with the knowledge and conduct

---

**3.** Hyosung's alternative cause of action alleges that Sumagh's original contractual obligation to provide fabric consisting of 65% rayon and 35% wool was later modified by the parties to require fabric with a fiber content of 70% rayon and 30% wool. Nevertheless, alleges Hyosung, this "amended" contract was breached by Sumagh when it provided fabric with an even greater rayon content.

**4.** Plaintiff argues that certain documents are inadmissible under either the Hearsay Rule or the Parol Evidence Rule. I disagree. First, the documents indicating that Orkid requested, received and/or approved samples of rayon/wool fabric sent by Sumagh are not hearsay, since they are offered merely to prove that the statements were made, and not "to prove the truth of the matter asserted." *See* Fed.R.Evid. 801(c). Second, the Parol Evidence Rule does not bar the admission of certain other documents. Where the "final expression" of the contract is part of a series of documents, the Parol Evidence Rule does not

apply. *See, e.g., B.N.E. Swedbank, S.A. v. Banker*, 794 F.Supp. 1291, 1292 (S.D.N.Y.1992) (stating that the rule is inapplicable where confirmation telex was contradicted by subsequent telexes and confirmation slip suggested that further documentation would be necessary).

**5.** Claims one through four, seven and nine are hereby dismissed.

**6.** The law is settled that there exists no private right of action under the Wool Products Labeling Act. *See Warren Corp. v. Goldwert Textile Sales, Inc.*, 581 F.Supp. 897, 899 (S.D.N.Y.1984) (a plaintiff "cannot create a private right of action under the Wool Act, nullifying the Act's own provisions, by asserting its standing to sue under the Lanham Act"). However, I note that as the Wool Act does not provide the exclusive remedy of mislabeling or misbranding a wool product, Plaintiff may still assert a claim under the Lanham Act. *Id.*

of its agent"). That rule applies even if the agent has withheld information from its principal. *Smalls v. Reliable Auto Service, Inc.,* 205 A.D.2d 523, 524, 612 N.Y.S.2d 674 (2d Dep't 1994) ("A principal is bound by notice to or knowledge of his or her agent in all matters within the scope of the agency, notwithstanding the fact that such information is never actually communicated to the principal.").

■ The evidence presented on this motion reveals the close relationship that existed between Hyosung and Orkid. From 1989 to late 1994, I.B. Lee, manager of Hyosung's Textile Department in New York, had frequent contact with Orkid, including daily telephone calls "like three or four times or more than five times, sometimes." Def. 3(g) ¶¶ 16–17. Additionally, Lee engaged in frequent written communications and bi-weekly face-to-face meetings with Orkid representatives. *Id.* ¶¶ 18–19.

When Orkid obtained a new purchase order from a customer, Hyosung gathered information concerning the customer's reputation, ability to pay, and potential for repeat orders. *Id.* ¶ 22. Hyosung also wanted to know as much as it could about the supply arrangement for a new purchase order, such as current and future costs of supplies, and "[o]ther details like the quality of the goods." *Id.* ¶¶ 23–25. In particular, Hyosung was interested in knowing whether the supplier was "likely to provide goods that would be satisfactory to the customer." *Id.* ¶ 26.

Despite this proof, a factual issue exists as to whether Orkid was Hyosung's agent. Under the Agreement, Hyosung had no control over the way in which Orkid sought, solicited or obtained a purchase order from a customer. Indeed, Hyosung may be nothing more than the financer of Orkid's business, albeit one with the appearance of a heightened interest in the financial strength of Orkid's customers. *See, e.g., Itel Containers Int'l Corp. v. Atlanttrafik Express Service Ltd.,* 909 F.2d 698, 702–03 (2d Cir.1990) (holding that two corporations were not principal and agent where the corporations operated independently, were not parent and subsidiary and did not have any common shareholders, officers or directors, *despite* the fact that one

provided financing for the other). Thus, I decline to grant summary judgment on this ground.

### C. *Orkid's Assignment of its Claims to Hyosung*

Hyosung's amended complaint alleges that "[p]rior to the commencement of this action, [Hyosung's] Assignor, Orkid Tex, Inc. assigned all of its rights, title and interests for and to the various contracts at issue herein with Sumagh ... to Hyosung." Am.Cplt. ¶ 1.

#### 1. *Characteristics of Assignor/Assignee Relationships*

■ An assignment does not generally modify the terms of an underlying contract. "It is a separate 'agreement' between the assignor and assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged." *Citibank, N.A. v. Tele/Resources, Inc.,* 724 F.2d 266, 269 (2d Cir.1983).

> It is elementary ancient law that an assignee never stands in any better position than his assignor. He is subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor.

*Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.,* 36 N.Y.2d 121, 125, 365 N.Y.S.2d 808, 325 N.E.2d 137 (1975); *see also Septembertide Publishing, B.V. v. Stein & Day, Inc.,* 884 F.2d 675, 682 (2d Cir.1989) ("It has always been the law in New York that an assignee stands in the shoes of its assignor and takes subject to those liabilities of its assignor that were in existence prior to the assignment."); *Equity Properties Corp. v. Bonhomme,* 124 Misc.2d 784, 785, 480 N.Y.S.2d 73 (1st Dep't App.Term 1984) (recognizing "common-law rule" that "an assignee stands in the shoes of his assignor").

■ As in a principal/agent relationship, the knowledge of an assignor must be attributed to its assignee. *See Friedman v. Nagin,* 270 A.D. 503, 505, 60 N.Y.S.2d 620 (1st Dep't 1946) ("Plaintiff as assignee stands in the shoes of his assignors and their knowledge is his."); *Timpone v. Concord Enter-*

*prises of Staten Island, Inc.*, 93 Misc.2d 691, 694, 403 N.Y.S.2d 457 (Sup.Ct.Richmond Co.1978) (applying *Friedman* rule and noting that "having become the assignee of the debentures, [plaintiff] is credited with the knowledge of the assignor"); *United States v. Seacoast Repair Co.*, 147 F.Supp. 686, 691 (E.D.N.Y.1957) ("[K]nowledge as to the source of funds from which payments were received on the part of the assignor-agent is material, even though the assignee had no knowledge").

### 2. *Orkid's Knowledge Regarding Fabric Provided by Sumagh*

 It is undisputed that Orkid assigned its rights in supply contracts with Sumagh to Hyosung. The relevant issue, then, is whether Orkid knew that Sumagh's shipment did not conform with San Moire's requirements. If the proffered evidence reveals that Orkid had such knowledge (and Hyosung cannot rebut that evidence), then such knowledge must be imputed to Hyosung and would bar a number of its claims.

A series of memoranda exchanged between Orkid and Sumagh reveal that Orkid was aware that the fabric produced by Sumagh did not contain 65% rayon and 35% wool as required by San Moire. On February 8, 1993, Orkid faxed the details of San Moire's order to Sumagh, stating "[w]e have order from customer 50,000 yds to start. But he absolutely needs 65 rayon 35 wool." Declaration of Harlan M. Lazarus, Attorney for Hyosung ("Lazarus Dec."), Ex. 3, Exhibits Marked at the Deposition of Robert Hsiao Jung Jo on June 20, 1995 at Pl.Ex. 5. Yet on February 11, Sumagh replied that for the best price, the fiber content of the fabric

would be 75% rayon, 25% wool. *Id.* at Pl.Ex. 9.

On February 22, 1993, Orkid questioned: "But why do you insist for doing rayon/wool 75/25% and not 65/35% [?] Is there any particular reason? Because customer wants 65/35% we have 50,000 Yds to start." *Id.* at Pl.Ex. 12. The following day, February 23, Sumagh replied: "The conten[t] is rayon/wool 75/25." *Id.* at Pl.Ex. 13. Additionally, over the next few weeks, in a series of memoranda faxed to Orkid, Sumagh identified several varieties of fabric which it could produce for Orkid, all consisting of either 70% or 75% rayon and the remainder wool. *See, e.g., id.* at Pl.Exs. 20, 22, 26.

Indeed, it appears that Orkid specifically instructed Sumagh to mislabel its goods and purchase orders to reflect the fiber content ordered by San Moire, when the fabric produced by Sumagh actually had a wool content of 30% or less. On October 9, 1993, after San Moire and Mervyn's had rejected the fabric as nonconforming, Sumagh confirmed its previous arrangement with Orkid:

> *Re: R/W problem* Pls see attached test report. The conten[t] is R/W 75/25. Maybe we have to change a litt[le] on construction? Also [because] wool fiber is so easy to be lost, *as per our agreement, the conten[t] should be 70/30 and you asked us to do documents with R/W 65/35,* so it showed [about] 5% wool fiber is lost. [Because] this [is] a new fabric for us, so our technique is still not proficient.

*Id.* at Pl.Ex. 128 (emphasis added).[7]

 I conclude that Orkid knew that Sumagh was delivering nonconforming fabric. Thus, all the claims arising from Orkid's

---

**7.** I note that Orkid's knowledge that Sumagh was providing nonconforming goods will not be imputed to Hyosung if one of Orkid's employees (or group of employees) was working outside the scope of his or their employment to coerce Sumagh into providing inadequate fabric.

The evidence suggests that this is plausible. All of the damning memoranda were sent either by or to Joe Amar, an employee and shareholder of Orkid who resigned before this action commenced. Def. 3(g) ¶¶ 40–46. Amar and Orkid were engaged in a traditional principal/agent relationship, the elements of which are described above.

To overcome the presumption that an agent's knowledge is imputed to its principal, the principal must demonstrate that the agent is "engaged in a scheme to defraud his principal," wherein he has "totally abandoned his principal's interests" and is "acting entirely for his own or another's purposes." *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784–85, 497 N.Y.S.2d 898, 488 N.E.2d 828 (1985). Here, though, there is no evidence to suggest that Joe Amar was not acting in the interests of Hyosung. Thus, there is nothing to defeat the general rule of imputation of knowledge to Hyosung.

relationship with Sumagh, and assigned by Orkid to Hyosung, are dismissed.[8]

### D. *The Letter of Credit Fraud Claim*

The letter of credit claim is predicated on a theory of fraud and fraudulent misrepresentation. At Sumagh's request, Hyosung opened a letter of credit (naming Sumagh as beneficiary) on February 12, 1993 in connection with the sale and purchase of the fabric. Am.Cplt. ¶¶ 50–51. As is typical in a letter of credit arrangement, four parties were involved in this transaction: the applicant, Hyosung; the issuing bank, The Commercial Bank of Korea, Ltd. ("Bank of Korea"); the destination bank, First Commercial Bank of Taiwan ("First Commercial"); and the beneficiary, Sumagh.

Under the letter of credit, the fiber content of the fabric was described as 65% rayon and 35% wool. *Id.* ¶ 51. Although Sumagh knew that the letter of credit required 65/35 fabric, it nevertheless "fraudulently shipped and delivered textile fabric having a fibre (sic) content other than 65% rayon, 35% wool." *Id.* ¶ 53. Additionally, Hyosung alleges that Sumagh created false documents fraudulently describing the fabric as 65% rayon and 35% wool "for the purpose of falsely and fraudulently drawing against" the letter of credit. *Id.* ¶ 56. Moreover, Hyosung maintains that it "was ignorant of the falsity of [Sumagh's] documents, and did not ascertain the falsity thereof until after [Hyosung] accepted delivery of the textile fabric." *Id.* ¶ 58.

Under New York law, the elements of common law fraud are (1) false representation(s) of (2) material fact with (3) intent to defraud thereby and (4) reasonable reliance on the representation (5) causing damage to plaintiff. *Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 310 (2d Cir.1994).

Sumagh argues that it is entitled to judgment as a matter of law on this claim because Hyosung could not have *reasonably* relied on any misrepresentations made by Sumagh. Sumagh contends that Hyosung should have known that the fabric shipped was non-conforming.

It is well settled that one who "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject" must make use of those means "or he will not be heard to complain that he was induced" by fraud. *Keywell Corp. v. Weinstein,* 33 F.3d 159, 164 (2d Cir.1994) (quoting *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80–81 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981)); *see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance."); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112 (2d Cir.1984). In *Aaron Ferer,* the court held that plaintiff's allegation that defendant misrepresented and concealed material facts with regard to a credit arrangement failed as a matter of law "because all of the information that plaintiffs now claim was concealed from them was either a matter of public record, was not pursued by plaintiffs, or was disclosed, at least in part," by defendant. 731 F.2d at 123. Specifically, the court stressed that although plaintiffs had all the resources of a recent bankruptcy litigation process available to them, they never attempted to use the available documentation to discover how defendant's credit arrangement operated. *Id.* at 124.

8. Hyosung's alternative claim is also dismissed. The alternative claim alleges that the contract between Orkid and Sumagh was later revised to call for fabric with a fiber content of 70% rayon and 30% wool, and that this "amended" contract was breached when Sumagh provided fabric with a rayon content above 70%. Even if true, a breach of this "amended" contract would not cause Hyosung to incur damages. San Moire was only interested in receiving fabric with a 65/35 rayon/wool content and would have rejected the fabric as nonconforming *even if* the fabric delivered met the 70/30 standard. *See, e.g.,* Def. 3(g) ¶ 115 (citing Deposition of Murray Russo, Feb. 10, 1995 at Ex. 17). Accordingly, Hyosung would have incurred the same measure of damages regardless of whether this "amended" contract was breached. Thus, Hyosung has not demonstrated that it has incurred damages as a result of the circumstances alleged in this claim.

■ Similarly, Hyosung failed to make use of information available to it. Hyosung was entitled, under its Agreement with Orkid, to receive "all details of the purchase." Def. 3(g) ¶ 6. Hyosung's approval was subject to its "satisfaction, in its discretion, with the terms of the transaction." *Id.* ¶ 5. Moreover, according to its officer, I.B. Lee, Hyosung was critically interested in details concerning Orkid's supply arrangements. *Id.* ¶¶ 23–26. Hyosung was in frequent communication with Orkid. *Id.* ¶¶ 17–19, 28. Hyosung also had frequent disputes with Orkid. *Id.* ¶¶ 31–36. Whenever Hyosung wanted to "protect" itself, it insisted on assurances in writing. *Id.* ¶ 27. Thus, if Hyosung had wanted to protect itself here, it could have insisted on reviewing pertinent correspondence between Orkid and Sumagh, or insisted that Orkid provide laboratory test results confirming that the fiber content of the fabric it received was correct.

Hyosung would have discovered that the fabric was nonconforming had it examined the relevant documentation or taken other steps available to it. Moreover, Hyosung received specific notice that

> [l]ately Orkid Tex, Inc. is facing a lot of claims and cancellations from our customers, because of U.S. customs, who is refusing the release of merchandise, which are wrongly marked on documents. Such as: full description of the goods, wrong visa, wrong conversion to sq/m, cartons and tags wrongly marked, and not matching documents etc . . .

Lazarus Dec. Ex. 3, Exhibits Marked at the Deposition of Robert Hsiao Jung Jo on June 20, 1995 at Pl.Ex. 32 (ellipsis in original). This notice was sent to Hyosung from Orkid on May 14, 1993, before the first shipment of fabric was made.

Between the date on which the letter of credit was opened (February 12, 1993) and the first delivery of fabric (June 1993), the letter of credit was amended at least six times, mostly to extend the date of delivery. *See* Am.Cplt.Ex.A. Two of these amendments were made *after* Hyosung received the above notice from Orkid. At any time during this period Hyosung could have reviewed the relevant documentation (or insisted on hav-

ing the fabric tested) and refused to amend the letter of credit further. Yet Hyosung apparently did nothing to protect itself even after receiving the notification of claims and cancellations from Orkid. Hence, Hyosung cannot claim to have *reasonably* relied on false representations when it elected to amend the letter of credit.

Although First Commercial cannot be faulted for accepting the fraudulent documentation when accepting the goods for shipment and paying on the letter of credit, it would not have been placed in such a position had Hyosung taken the time to review the relevant documentation available to it. Had Hyosung simply exercised its rights under the Agreement and reviewed "all details of the purchase," it would have discovered the true fiber content of the fabric and would have cancelled the letter of credit prior to shipment (instead of continuously amending it). Hyosung's failure to make use of information available to it effectively caused First Commercial to accept the relevant documentation and make payment on the letter of credit. Accordingly, the bank's payment (albeit a payment made in ignorance of the fraud that was being perpetrated) is insufficient to support the reasonable reliance element of Hyosung's fraud claim.

Because Hyosung could not have reasonably relied on any misrepresentations Sumagh made, Sumagh is entitled to summary judgment on this claim.

### E. *The Lanham Act Claim*

Hyosung alleges that Sumagh violated 15 U.S.C. § 1125(a), also known as § 43(a) of the Lanham Act. Specifically, Hyosung alleges that "[i]n connection with the marketing of . . . fabric, [Sumagh] is employing false descriptions, and is making and has made false representations concerning the wool content of the textile fabric by using words . . . in the labeling . . . tending to falsely describe" the fabric. Am.Cplt. ¶ 36. Hyosung asserts that it has standing to sue because it was "materially deceived" by Sumagh, "causing [Hyosung] to lose sales and payments." *Id.* ¶ 38. In reference to this claim, Hyosung demands "a preliminary and permanent injunction enjoining [Sumagh

from] causing the aforesaid textile fabric to be offered for sale or sold with the ... false descriptions and representations." *Id.* ¶ 39. Unlike the Wool Act, this section of the Lanham Act provides for a private cause of action. *See Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186, 189 (2d Cir. 1980).

Under § 43(a) of the Lanham Act, as amended effective November 16, 1989,

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1989).

In this circuit, standing to sue under this section has been limited to commercial parties, thus excluding mere consumers. *PPX Enterprises, Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 124 (2d Cir.1984). While a plaintiff under § 43(a) need not be a direct or indirect competitor of the alleged violator, he must at a minimum establish "the potential for a competitive or commercial injury." *Rosenfeld v. W.B. Saunders,* 728 F.Supp. 236, 242 (S.D.N.Y.1990), *aff'd,* 923 F.2d 845 (2d Cir.1990) (citing *Berni v. Int'l Gourmet Restaurants of America, Inc.,* 838 F.2d 642, 648 (2d Cir.1988)). Although the statute is intended to be broadly construed, a plaintiff must allege more than "mere subjective belief" about damages. *Nat'l Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Laboratories,* 850 F.2d 904, 914 (2d Cir.1988). What matters is whether a commercial party has a "reasonable interest to be protected" against the alleged false advertising. *Id.*

I am not convinced that the facts of this case present a viable claim under the Lanham Act. In order to prevail under the Lanham Act, the plaintiff must show a likelihood of confusion on the part of the public. *See Nike, Inc. v. "Just Did It" Enters.,* 6 F.3d 1225, 1227 (7th Cir.1993); *Coca-Cola Co. v. Procter & Gamble Co.,* 822 F.2d 28, 31 (6th Cir.1987) ("Protecting consumers from false or misleading advertising, moreover, is an important goal of the statute and a laudable public policy to be served."). This has not been done.

The Act requires that to state a claim under this section, the false description of the quality of the fabric must occur in an *advertisement* or *promotion.* The "advertisement or promotion" clause requires public dissemination of the alleged fraudulent or misleading information. "[A]dvertising is not limited to newspaper, television or radio announcements; any notice *addressed to the public* serves the same purpose." *Warren Corp. v. Goldwert Textile Sales, Inc.,* 581 F.Supp. 897, 900 (S.D.N.Y.1984) (citation omitted).

Quite clearly, neither advertisement nor promotion is involved in this dispute— merely shipping documentation containing a misrepresentation as to the fabric's fiber content. This false description, which appears on the purchase orders and not the fabric itself, will *never* reach the public domain. This action does not involve the protection of public interests addressed by the Lanham Act. On this last point, I note that the product itself—the fabric—must still be cut and sewn into clothing before it is made available to the public. Certainly, the final product could quite easily reflect the correct rayon content of the fabric through the attachment of an accurate label.

In short, it appears that Plaintiff is attempting to dress up a contract dispute as a Lanham Act claim. Accordingly, this claim is dismissed.

## V. *Conclusion*

For the foregoing reasons, all claims are dismissed.

SO ORDERED.