PEERLESS MILLS, INC.,
Plaintiff-Appellant,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Defendant and Third-Party Plaintiff-Appellee,

v.

HERTZ, WARNER & CO., a partnership, et al., Third-Party Defendants-Appellees.

No. 17, Docket 74-2627.

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1975.

Decided Nov. 26, 1975.

446

Anthony S. Genovese, New York City (Kissam & Halpin, New York City, Michael F. Fitzgerald, New York City, of counsel), for plaintiff-appellant.

Steven F. Goldstone, New York City (Davis Polk & Wardwell, New York City, S. Hazard Gillespie, New York City, of counsel), for defendant and third-party plaintiff-appellee.

Leon B. Lipkin, New York City (Lipkin & Weisberg, New York City, Sidney A. Weisberg, New York City, of counsel), for third-party defendants-appellees.

Before MULLIGAN, OAKES and MESKILL, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from an order of the United States District Court, Southern District of New York, Hon. Marvin E. Frankel, J., entered on November 6, 1974, which dismissed the claims of plaintiff Peerless Mills, Inc. (Peerless) against defendant American Telephone & Telegraph Company (AT&T) and the claims against third-party defendants Hertz, Warner & Co. (HW&Co), Irving Hertz (Hertz), and Henry Warner (Warner). We affirm the judgment.

I

In 1963 third party defendant Paul Cohn, aged 23 at the time, became a founding partner in the securities brokerage firm of Hertz, Neumark & Warner, the predecessor of HW&Co, a limited partnership and a member firm of the New York Stock Exchange (NYSE). Cohn withdrew as a partner from the predecessor firm in 1965 but remained as an employee of that firm and its successor HW&Co. In 1968 Cohn married the daughter of A. C. Fine who was then the President and sole stockholder of Peerless. Cohn became increasingly active in the syndication department of HW&Co and was earning about $33,000 per annum by the fall of 1968. In the spring of 1969 he indicated to third-party defendant Warner his interest in once more becoming a general partner in the firm. Judge Frankel found that Cohn knew that the first six months of the firm's fiscal year beginning July 1, 1968 were very profitable, with earnings of about $1,000,000. However, he was not advised by either Hertz or Warner, and did not know, that the early months of 1969 were showing substantial losses, so that eventually the year's losses would practically wipe out the earnings of the first half. The court below found as a fact that there was no intention on the part of the third-party defendants to mislead Cohn and that they were entitled to assume that Cohn would observe the changing conditions of the industry and the "profound revisions in the struc-

ture and character of the [securities] business." As a condition of becoming a partner, Cohn was told in March or April, 1969 that his annual salary would be $15,000 and that his participation would be three per cent of the firm's profits, and four-and-one-half per cent of its losses. He was also advised that he would be expected to make a capital contribution of $100,000. Hertz and Warner were aware that Cohn would probably be borrowing for this purpose from his inlaws the Fines. In October, 1969 Cohn obtained a loan from Peerless of 2,000 shares of stock of the defendant AT&T. In connection with the loan Peerless executed a securities loan agreement which released HW&Co from any liability to Peerless. On November 19, 1969 the 2,000 shares of AT&T stock delivered by Peerless were registered in the name of HW&Co. Although the partnership year ran from July 1, 1969, Cohn did not actually sign the partnership agreement until late November or early December 1969, but it was effective as of July 1, 1969. The HW&Co statement for fiscal 1969 was published in late December, 1969, disclosing the losses of the firm. Shortages in the capital accounts of some of the partners also became known and the romance between Cohn and HW&Co came to an end. In February, 1970 Cohn and another young partner, Joel Held, consulted counsel to explore the possibility that they had been fraudulently induced to enter the firm. On May 1, 1970, with the assistance of another partner, Robert Sadlier, Cohn caused the transfer of twenty 100-share certificates of AT&T stock held by HW&Co into a 2,000 share certificate (No. 0471–0429) in the name of Peerless. These were not the same shares loaned by Peerless to Cohn which in fact had been previously disposed of by HW&Co on the open market on January 30, 1970. No member of HW&Co had authorized the transfer secretly effected by Sadlier and Cohn. After Cohn had consulted new counsel, Peerless advised AT&T on July 6, 1970 that it wanted a "stop transfer" order placed on the substituted 2,000 share certificate now held in its name through the

machinations of Cohn and Sadlier. The order was recorded on the books of AT&T on that day. The next month after having learned of the transfer to Peerless, Hertz demanded that Cohn arrange for the transfer of the shares back to the firm. Cohn refused and thereafter was suspended as a partner of HW&Co. On September 15, 1970 HW&Co requested AT&T that the 2,000 share certificate, which had remained in its office, be transferred from Peerless to HW&Co. AT&T made the transfer and issued a new certificate to HW&Co. Pursuant to its request HW&Co represented that Peerless had no interest in the securities and agreed to indemnify AT&T against any loss resulting from the transfer. When Peerless later protested, AT&T initially took the position that a mistake had been made. AT&T ultimately concluded, however, that Peerless was not the rightful owner and that none of its rights had been violated by AT&T.

Peerless then instituted this action against AT&T by filing its complaint on March 1, 1971, praying for a judgment directing AT&T to issue a certificate of 2,000 shares of AT&T stock to Peerless, plus all accrued dividends with interest. AT&T in turn impleaded HW&Co and its general partners, including Cohn. In an amended complaint filed on July 23, 1971 Peerless also asserted claims against HW&Co, Hertz and Warner. Peerless urged essentially that Cohn had never become a partner of HW&Co, which had thus converted the Peerless shares loaned to Cohn; that the defendants had made a false representation as to the firm's status to Cohn and through Cohn to Peerless and that Peerless would not have loaned the stock but for the false representations. The action was tried before Judge Frankel without a jury. He made extensive findings of fact and conclusions of law filed on October 31, 1974, and the judgment appealed from dismissed both complaints against AT&T as well as the third-party complaint. (A counterclaim by HW&Co and Hertz and Warner was also dis-

missed but no appeal has been taken from that dismissal).

## II

On this appeal Peerless urges that the District Court was in error in holding that Cohn was a partner of HW&Co as a matter of law, and therefore in holding that the AT&T stock transferred as a loan to Cohn was not converted. Appellant argues that since at least nineteen intended partners did not sign the proposed July 1, 1969 partnership agreement, including the so-called Meyer-Blau group which represented approximately $1.7 million in capital to HW&Co and which was to assume eighteen per cent of the losses, no partnership was created. The difficulty with this position is that there is no evidence which would indicate that Cohn ever made it a condition to his becoming a partner that the Meyer-Blau group or anyone else would also become partners. On the contrary on his cross-examination below Cohn admitted that the question of Meyer and Blau signing the contract was not on his mind. Judge Frankel found as a fact

> That they [the Meyer-Blau group] would surely sign was not "represented" to Cohn or insisted upon by him as an essential preliminary to his membership. Whether the Meyer-Blau group would be in or out was, as Cohn testified, "not a question in [his] mind" when he made his capital contribution, having effectively been a partner for some five or six months before.

Appellant next contends that Cohn did not become a partner because the partnership agreement was not filed with the NYSE pursuant to its Rule 313, nor was there compliance with New York Partnership Law §§ 91(1)(a) and 91(1)(b) which require as a condition to the creation of a limited partnership that a certificate containing pertinent information must be signed and acknowledged and must be filed in the office of the appropriate County Clerk. Whatever effect the conceded failure of HW&Co

to comply with these filing provisions may have with respect to the firm's relationship to the NYSE or to third parties is not before us. We note that Cohn's status as a partner is now in arbitration proceedings before the NYSE. Cohn is not a party here and is making no claim before us that he failed to become a partner. It may well be that the failure to file the certificate required by section 91 did prevent the creation of a limited partnership in New York. However Cohn was a general partner in the firm and a general partnership would in any event exist between Cohn and the other general partners.[1] Cohn signed the partnership agreement, took partnership drawings and held himself out as a partner. We hold therefore that since he was a general partner, the claim that HW&Co converted the AT&T stocks because of a failure of consideration or breach of a condition necessarily collapses. If any conversion took place the tortfeasor was Cohn and not his firm.

### III

Peerless next argues that it was fraudulently induced to transfer its AT&T stock to HW&Co, since the firm and Hertz and Warner were under an affirmative duty to disclose to Cohn and to Peerless all the material facts concerning the financial condition of the firm prior to the signing of the agreement and prior to the delivery of the stock by Peerless. Specifically appellants urge that there was an obligation on the part of the firm and the partners Warner and Hertz to disclose to Cohn the losses of 1969 which eventually almost wiped out the profits for that fiscal year. It is not disputed, and the court below found, that Hertz painted an optimistic picture of the firm's future in discussing Cohn's potential partnership; he stressed the high earnings of the last six months of 1968 but no mention was made of the losses in the early months of 1969, though they were known to him. There is no question but that one party to a business transaction is under a duty to disclose to the other such additional matters known to him in order to prevent his partial statement of the facts from being misleading. E. g., *SEC v. Great American Indus., Inc.*, 407 F.2d 453, 461 (2d Cir. 1968) (*en banc*), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969); Restatement (Second) of Torts § 551(2)(b) (Tent. Draft No. 12, 1966). Cf. *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 388 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). We have no doubt that the failure to disclose the firm's losses in the first half of 1969 prior to Cohn becoming a partner would constitute common law fraud, assuming that Cohn was not already aware of them. There is a major obstacle however to the appellant's claim here: Cohn, the allegedly defrauded partner to whom the firm had a fiduciary obligation, is not our plaintiff. His problems with the partnership have been submitted, as we have indicated, to the NYSE. The plaintiff-appellant is a third

---

1. The Uniform Limited Partnership Act was adopted by New York in 1922. Failure to comply with its requirements for establishing a limited partnership precludes the formation of such a partnership, but instead renders the association a *general* partnership; in other words, a partnership is formed, albeit not a limited one. See, e. g., *Filesi v. United States*, 352 F.2d 339, 341 (4th Cir. 1965); *Bisno v. Hyde*, 290 F.2d 560, 561 (9th Cir. 1961), cert. denied, 368 U.S. 959, 82 S.Ct. 403, 7 L.Ed.2d 390 (1962); *Bergeson v. Life Ins. Corp.*, 265 F.2d 227, 235 (10th Cir.), cert. denied, 360 U.S. 932, 79 S.Ct. 1452, 3 L.Ed.2d 1545 (1959). See also *Hoefer v. Hall*, 75 N.M. 751, 411 P.2d 230, 233 (1965) (purpose of recording certificate of limited partnership is to acquaint *third persons* dealing with the partnership with its status. Hence, when neither the rights of third parties nor a partner's claim of limited liability is involved, failure to record the certificate cannot affect the existence of a limited partnership insofar as the partners, *inter se*, are concerned).

*United States v. Coson*, 286 F.2d 453, 462 n.13 (9th Cir. 1961) holds that failure to comply with statutory provisions to form a limited partnership does not render a limited partner liable as a general partner under the Uniform Limited Partnership Act. However, Cohn was and intended to become a general partner here.

party, Peerless, which in fact is Cohn's in-laws, the Fines. A third party can recover damages for a fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that the defendants intended the misrepresentation to be conveyed to him.[2]

The court below found as a fact that plaintiff herein—formally a corporation, practically Cohn's in-laws—has no basis for its claim of fraud against the partnership or any member thereof because "there was no deception of the Fines . . ., direct or indirect, by any member of [HW&Co]. In a general atmosphere of trust and affection, the Fines asked Cohn little or nothing about the firm or his projected status as a partner. He expressed generally rosy hopes. They were pleased for him over his seeming rise in the securities industry. They neither sought nor received any concrete information about the state of the partnership or its prospects."

It is significant that although appellants in response to a Notice of Deposition indicated that Mr. and Mrs. Fine would be the witnesses for Peerless, only Mrs. Fine appeared. Her testimony set forth in part in the margin[3] makes it abundantly clear that we cannot appropriately term the finding of fact of the trial court that there was no reliance by Peerless clearly erroneous. Mrs. Fine was not depending upon any representations of the firm or any concrete or specific details about the business of the firm but was understandably anxious to have her son-in-law, Cohn, become a partner in any event. If Mr. Fine, the President of Peerless, and presumably more knowledgeable in its business dealings than his wife, made any inquiries or relied in any way upon the firm's repre-

**2.** On the need for reliance in the third-party situation, see, e. g., *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 378 F.Supp. 112, 131–32 (S.D.N.Y.1974), appeal pending (applying New York law) (plaintiffs were securities purchasers who sued accounting firm which allegedly was guilty of fraud in preparing issuer's financial reports); *Denkensohn v. Ridgway Apartments, Inc.*, 13 Misc.2d 389, 392–93, 180 N.Y.S.2d 144, 148 (App.Term, 2d Dep't 1958); *Miller v. Greyvan Lines, Inc.*, 284 App.Div. 133, 138, 130 N.Y.S.2d 378, 383 (4th Dep't 1954), aff'd, 308 N.Y. 853, 126 N.E.2d 183 (1955); *Wechsler v. Hoffman-LaRoche, Inc.*, 198 Misc. 540, 99 N.Y.S.2d 588, 590 (Sup. Ct.1950); Restatement (Second) of Torts § 531, at 95 (Tent. Draft No. 10, 1964). That reliance is generally necessary to state a claim for fraud is, of course, beyond cavil, e. g., *National Conversion Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621, 626, 298 N.Y.S.2d 499, 503, 246 N.E.2d 351, 354 (1969).

For the need for the defendant to have intended his misrepresentation to reach and influence the third party, see *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 179, 174 N.E. 441, 444 (1931) ("To creditors and investors to whom the employer exhibited the certificate, the defendants owed a . . . duty to make it without fraud, since there was notice in the circumstances of its making that the employer did not intend to keep it to himself."); Restatement (Second) of Torts, *supra*, at 95–96; Prosser, Misrepresentation and Third Persons, 19 Vand.L.Rev. 231, 239, 240–

42, 254–55 (1966). And see the excellent discussion in *Nader v. Allegheny Airlines, Inc.*, 512 F.2d 527, 547–48 (D.C. Cir. 1975).

**3.** Q. Did Mr. Cohn ever tell you anything about Hertz, Warner and Company? A. Well, he worked there, he worked there for many years, ten years, I believe.

Q. Did he tell you anything about the business, Mrs. Fine? A. Well, he wasn't going to—There wasn't any details about the business. It is a brokerage business, very promising, very lucrative.

Q. Did he tell you it was a very promising and lucrative brokerage business? A. We thought it was. I don't remember him saying it in specific words.

Q. Did you ask him any questions about Hertz, Warner & Company? A. Did we ask him?

Q. Yes, or about the transaction whereby he might become a partner? A. Did we ask him about it?

Q. Yes, do you recall looking into the matter, in other words? A. We took his word or whatever he felt—if he felt that it would promote or better his situation, we were very—we were pleased to do it.

Q. Did he say that Mr. Hertz or Mr. Warner had made any specific representations to him about the business? A. I don't know. Deposition of Margaret Fine, Sept. 10, 1971, by attorneys for HW&Co.

sentation as to the profits made in 1968, he failed to come forward to so testify. There is no reason given for his failure to appear to be deposed and we cannot assume that his testimony would be helpful. On the contrary, we may assume that it would be detrimental. See, e. g., *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 174 & n.3, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *NLRB v. Dorn's Transp. Co.*, 405 F.2d 706, 713 (2d Cir. 1969); *United States v. Dibrizzi*, 393 F.2d 642, 646 (2d Cir. 1968); McCormick, Evidence § 272 and cases cited (2d ed. 1972).

Aside from the failure to show reliance by Peerless, there is no showing that the appellees intended that Cohn convey their representations to the Fines. Appellant has relied upon section 533 of the Restatement of Torts for the proposition that the maker of a fraudulent misrepresentation is subject to liability to another who acts in justifiable reliance upon it, if the misrepresentation is made to a third person (here Cohn) for the purpose of having him repeat its terms or communicate its substance to the other (Peerless) in order to influence the latter's conduct in a particular transaction. While HW&Co through Hertz and Warner knew that Peerless was the probable source of Cohn's contribution, Comment b to the Restatement section just cited provides "It is not enough . . . that the maker of the misrepresentation knows that its recipient may probably, or will to a substantial certainty, repeat it to a third person . . . The misrepresentation must be made for the purpose of having it repeated in terms or communicated in substance to the third person." Even rejecting *arguendo* the finding of fact below that "there were no fraudulent statements or omissions to Cohn by any member of the firm," there is nothing in the record to establish that HW&Co or its partners intended Cohn to repeat the rosy picture of fiscal 1968 to his in-laws. Certainly, Mrs. Fine's testimony negates any re-

liance upon representations by HW&Co. In sum, we think that the failure to establish reliance by Peerless on any representation by HW&Co or its partners as well as failure to establish that the firm intended Cohn to relay its misleading representation to Peerless, are necessarily fatal to the case. We do not consider the finding of the court below that Cohn was not misled because his ignorance of the firm's true financial picture was due to his own indifference and inattention and lack of inquiry, since Cohn is not seeking any relief here. Obviously, in view of his fiduciary relationship as a partner, the responsibility of HW&Co to him is greater than that to third parties. Moreover, this disposition of the case makes it unnecessary to discuss the waiver of liability by Peerless to HW&Co, contained in the securities loan agreement, which in the absence of fraud would seemingly preclude this action.

█ Since appellant's case against AT&T is premised upon its right to the AT&T stock, it is quite obvious from the foregoing that there is no liability on the part of AT&T. In the original complaint the appellant urged that it was the owner of the 2,000 shares of AT&T common stock evidenced by a stock certificate bearing number 0471–0429. These were not the shares Peerless originally loaned Cohn so that he could make his capital contribution to the firm. Those were sold on the open market on January 30, 1970. The shares sought to be reclaimed were those converted by Cohn from HW&Co. Peerless has no possible right to reclaim these shares. Reclamation as provided by the Uniform Commercial Code § 8–315 is limited to the self-same security wrongfully diverted. 3 R. Anderson, The Uniform Commercial Code § 8–315:3, at 775–76 (2d ed. 1971); see Israels, Practice Commentary for N.Y. U.C.C., § 8–315 at 265 (McKinney 1964). See generally Restatement of Restitution § 215 (1937).

We conclude that since Cohn was a partner and there was no reliance by Peerless upon any misrepresentation by

HW&Co or Hertz or Warner and none was intended to be conveyed to Peerless, this appeal must fail.

Affirmed.