UNION CARBIDE CORPORATION, individually and on behalf of and as the successor in interest of Seadrift Polypropylene Company, Plaintiff,

v.

MONTELL N.V.; Montell Polyolefins; Montell North America Incorporated; Montell USA Incorporated; Technipol S.r.l.; Montedison S.p.A.; Montell Finance USA, Inc.; Royal Dutch Petroleum Company, p.l.c.; the Shell Transport and Trading Company, p.l.c.; Shell Petroleum N.V.; the Shell Petroleum Company Limited; Shell Petroleum Inc.; Shell Oil Company; Shell Polypropylene Company; Shell Canada Limited; Shell International Chemical Company Limited; and Shell Internationale Research Maatschappij B.V., Defendants.

No. 95 Civ. 0134(SAS).

United States District Court,
S.D. New York.

July 2, 1998.

---

John A. Herfort, Gibson, Dunn & Crutcher LLP, New York, NY, for Plaintiff.

William C. Slusser, J. Michael Baldwin, Baker & Botts, L.L.P., Houston, TX, Michael A. Lippert, Baker & Botts, L.L.P., New York, NY, Steven M. Edwards, Davis, Scott, Weber & Edwards, P.C., New York, NY, for Defendants Shell Oil Company and Shell Polypropylene Company.

William C. Pelster, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, Scot B. Hutchins, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, Robert G. Stachler, Taft, Stettinius & Hollister LLP, Cincinatti, OH, for Defendant Montedison S.p.A.

Rory O. Millson, Max. R. Shulman, Katherine B. Forrest, Cravath, Swaine & Moore, New York, NY, for All Other Defendants.

## *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiff Union Carbide Corporation ("UCC") filed a Fourth Amended Complaint on September 24, 1996, asserting a variety of tort, contract and antitrust claims arising out of its business dealings with defendant Shell Oil Company ("SOC") in the 1980's and early 1990's. On May 27, 1998, defendants made seven separate motions seeking summary judgment on ten of UCC's claims. The majority of one of these motions—SOC's motion for partial summary judgment on UCC's first, second and ninth claim for relief—was decided at a hearing held on June 10, 1998. This opinion resolves the one issue left open at that hearing: Whether SOC is entitled to summary judgment on the portion of UCC's fraud claim that relates to the appraisal proceedings conducted by Morgan Stanley.

### I. Factual Summary [1]

In 1983, UCC and SOC executed a contract which they refer to as the "Cooperative Undertaking Agreement" ("CUA"). *See* Defendant Shell Oil Company's Exhibits in Support of Motion for Partial Summary Judgment on UCC's Three TPF–Related Claims ("Shell TPF Exhibits"), Ex. 6. Pursuant to this agreement, the parties jointly became involved in the business of licensing polypropylene manufacturing technology. *See* Plaintiff Union Carbide Corporation's Response to Opposition to Defendant Shell Oil Company's Statement of Material Facts Not at Issue in Support of Motion for Partial Summary Judgment on UCC's "Three TPF–Related Claims" ("UCC's TPF 56.1") at ¶ 2(a).[2] Part of this joint effort involved sales of certain catalysts by SOC to the parties' licensees which are necessary for the production of polypropylene. *See id.* at ¶ 2(b). SOC agreed that in the interest of maximizing

---

1. For the purposes of this motion, where plaintiff has met its burden of identifying relevant, admissible evidence, its version of the disputed facts is accepted as true. *See* Part II, *infra.*

2. Because this document fully incorporates SOC's corresponding submission, citations will be to it alone.

licensing revenues, its profits on these sales would be limited to cost plus a "reasonable" return on capital. *See id.* at ¶ 4. The CUA also provided that SOC would sell catalyst to the parties' jointly-owned partnership for use at a demonstration polypropylene plant in Seadrift, Texas. *See id.* at ¶¶ 5–6. SOC agreed that its profits on these sales would be limited to cost plus a 12% return on capital. *See id.* at ¶ 7.

In 1990, SOC developed a "Mixed Solvent Recovery" ("MSR") process which enabled it to reduce the amount of toxic waste generated by its catalyst production, and therefore to lower its waste disposal costs. *See id.* at ¶¶ 10–11. In 1992, it began construction of a facility in Norco, Louisiana to take advantage of this new technology; this facility began operation in 1993. *See id.* at ¶ 12(a).

According to SOC, the MSR components of the Norco plant were run as a "separate business center," independent of the "SHAC II" process that comprised the remainder of the catalyst manufacturing business. *See id.* at ¶ 15(a); Shell TPF Ex. 36 at 53–56, 60–64. According to UCC, however, MSR was an inseparable and integral part of the catalyst operation as a whole.

In 1992, SOC became interested in a new venture with defendant Montedison. *See* UCC TPF 56.1 at ¶ 17. Because this venture was incompatible with SOC's existing relationship with UCC, SOC began discussions with UCC regarding the termination of the CUA. *See id.*

The Montedison negotiations—which ultimately led to the formation of a company called Montell—became the subject of antitrust proceedings before the Federal Trade Commission. *See id.* at ¶ 18. In 1995, the FTC, Montedison, and SOC signed a Consent Order pursuant to which SOC agreed to divest itself of its existing polypropylene assets in order to facilitate the formation of Montell. *See id.* at ¶ 20. As part of this agreement, SOC committed itself to the transfer of those assets to the Shell Polypropylene Company ("SPC"), and the subsequent sale of SPC. *See id.* at ¶¶ 21–22. The day the Consent Order was executed, UCC filed this lawsuit and moved for a preliminary injunction prohibiting the formation of Montell until the sale of SPC was completed. *See id.* at ¶ 23. As a result of extensive settlement negotiations, UCC withdrew its motion when SOC agreed to sell SPC for 85% of its market value, as determined by an independent appraiser. *See* SOC TPF Exhibits, Ex. 9.

Both sides then submitted their views on SPC's proper valuation to an independent, court-appointed appraiser, Morgan Stanley. *See id.* at ¶ 40. To substantiate its argument that SPC should be given a relatively high valuation, SOC contended that (1) the MSR process was separate from the SHAC II operation; (2) a "reasonable" return for the purposes of the CUA would be at least 25% and possibly over 50%; (3) SOC, not UCC, had the right to license MSR technology under the CUA; and (4) the catalyst prices SOC had charged in 1995 were within the limits set by the CUA, and future price increases could be expected. *See* SOC TPF Exhibits, Ex. 39, 25. UCC expressed its contrary view on at least some of these issues to Morgan Stanley. *See* UCC TPF 56.1 at ¶ 41.

Morgan Stanley concluded that the fair market value of SPC was $275 million, based in part on its acceptance of SOC's arguments regarding the interpretation of the CUA. *See id.* at ¶ 46. Shortly thereafter, UCC announced its intention to purchase SPC for $234 million ($275 million × 85%).

## II. Legal Standard

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.,* 996 F.2d 537, 542 (2d

Cir.1993). Once this burden is met, the non-movant must produce evidence from which a rational jury could find in its favor. *See R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 58 (2d Cir.1997). In determining whether summary judgment should be granted, the court resolves all ambiguities and draws all reasonable inferences against the moving party. *See id.*

### III. Discussion

■ UCC now contends that each of the four arguments it has identified fraudulently induced Morgan Stanley to make an artificially high valuation of SPC. Under New York law, a plaintiff seeking to recover on a fraud claim must show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995).

### A. Alleged Misrepresentations of Fact

■ SOC argues that there is no evidence in the record that could satisfy the first element of this test, as each of its alleged misrepresentations relate to questions of opinion—i.e. the proper construction of the CUA—rather than fact. It is well-established that a plaintiff is generally required to show that an alleged fraudulent statement is one of fact. *See National Conversion Corp. v. Cedar Building Corp.,* 23 N.Y.2d 621, 627, 298 N.Y.S.2d 499, 246 N.E.2d 351 (1969) ("[A] pure opinion of law ... may not, except in unusual circumstances, base an action in tort...."); *Sirohi v. Lee,* 222 A.D.2d 222, 634 N.Y.S.2d 119, 120 (1st Dept.1995) ("[A] mere expression of opinion ... is insufficient to support an action for fraud."); N.Y. Jur.2d, Fraud and Deceit § 29. This rule has particular force when the opinion relates to an issue that was known to be in dispute at the time the statement was made. *See 600 West 115th Street Corp. v. 600 West 115th Street Condominium,* 180 A.D.2d 598, 580 N.Y.S.2d 307, 308 (1st Dept.1992) (defendant's assertion of le-

gal right did not constitute fraud when the existence of that right was understood to be disputed). However, even an expression of opinion may be actionable if it is not sincerely held. *See National Conversion Corp.,* 23 N.Y.2d at 628, 298 N.Y.S.2d 499, 246 N.E.2d 351 ("[T]he modern rule extends even further to cover a false opinion of law if misrepresented as a sincere opinion.").

SOC contends that each of its alleged misrepresentations was an expression of a sincerely-held belief regarding the proper construction of the CUA, and therefore cannot support a fraud claim. I will address each category of its alleged misstatements in turn.

### 1. Statements Regarding the Separate Nature of MSR and SHAC II

■ The falsity of SOC's representations regarding the independence of MSR and SHAC II, according to UCC, is demonstrated by the following: (1) a 1994 tax questionnaire completed by SOC in which MSR and SHAC II are described as "a single business component/subpart"; (2) charts from a 1995 "Catalyst Business Team Meeting" that include combined financial data from MSR and SHAC II; (3) internal SOC accounting reports calculating MSR and SHAC II costs collectively, and (4) statements by various SOC managers indicating that they viewed the MSR and SHAC II processes as interrelated. *See* Plaintiff Union Carbide Corporation's Exhibits in Opposition to Defendant Shell Oil Company's Motion for Partial Summary Judgment on UCC's "Three TPF-Related Claims" ("UCC TPF Exhibits"), Exs. 35, 31, 32, 9, 34, 26, and 13, respectively.

A rational juror could find from this evidence that SOC's representations to Morgan Stanley regarding MSR and SHAC II were fraudulent. As SOC points out, the question of whether MSR and SHAC II were separate businesses for the purposes of the SPC valuation is ultimately a matter of contractual interpretation: The question is not whether the processes were "separate" or "integrated" in some absolute sense, but whether the CUA permitted SOC to maintain its catalyst prices by separating one cost-reducing element out of the catalyst production process. Therefore, SOC correctly argues that its rep-

resentations on the subject are statements of opinion regarding a disputed legal issue rather than statements of fact. However, the evidence UCC points to arguably shows that for every purpose other than the calculation of catalyst production costs—i.e. every purpose except for the one that would allow it to benefit at UCC's expense—SOC viewed MSR and SHAC II as one and the same. A rational juror could conclude from this that the position SOC took before Morgan Stanley was not honestly held.

### 2. Statements Regarding the Catalyst Pricing Provisions of the CUA

■ Noting that the CUA limited SOC's return on catalyst sales to the Seadrift partnership to 12%, UCC also argues that SOC's position that it was allowed to earn 50% or more on sales to licensees was fraudulent. To support this theory, UCC points to deposition testimony indicating that a UCC employee involved in the CUA negotiations understood the limit on all catalyst sales to be 12%. *See* UCC TPF Exhibits, Ex. 41 at 676. UCC also contends that SOC's true opinion as to the meaning of the disputed clause was revealed by John Goodenbour, SOC Venture Manager for the UCC/SOC Venture, who testified at deposition that he concluded in the late 1980's that SOC "ought to be getting 20 percent" on catalyst sales to licensees. *See* UCC's Letter to the Court dated June 16, 1998, Ex. D at 123.

A rational juror could not conclude from this evidence that SOC's statements to Morgan Stanley were fraudulent. Testimony from a UCC employee as to his understanding of the disputed clause can hardly be said to show that SOC's contrary view was arrived at in bad faith. As to the Goodenbour

testimony, I note that the position he took is entirely consistent with SOC's position that the CUA's definition of a "reasonable" rate of return may vary over time, depending on market conditions. *See* SOC's Letter to the Court dated June 22, 1998 ("SOC Letter") at 6. This evidence is therefore not probative of SOC's alleged bad faith.

### 3. SOC's Representations Regarding its Rights in MSR

■ UCC also contends that SOC fraudulently claimed during the appraisal process the exclusive right to use and license MSR technology. This position was legally unsound, UCC argues, because MSR was really shared "Joint Development Technology" under the CUA. UCC TPF Exhibits, Ex. 1 at 16. UCC contends that the following items of evidence could show that SOC knew that its position had no merit: (1) the testimony of a UCC employee indicating that SOC agreed to combine MSR and SHAC II technology in a license to a third party; (2) a memo from SOC to UCC listing MSR as a "shared ... invention"; (3) minutes of a UCC/SOC meeting in which obtaining a patent for MSR was discussed; and (4) a memo from SOC to UCC regarding MSR patent issues. *See* UCC TPF Exhibits, Ex. 55 at 131–32, Ex. 56, Ex. 58 and Ex. 60, respectively.[3]

This evidence could not support a rational finding of fraud. As SOC points out, it was at least as available to UCC as it was to SOC at the time of the appraisal,[4] yet UCC decided not to produce it to Morgan Stanley. In light of this decision, a juror could hardly conclude that SOC's failure to produce demonstrates an intent to defraud UCC.

3. At a hearing held on June 10, 1998, I asked UCC specifically to identify, in a letter to the Court, the alleged misrepresentations and omissions that SOC made to Morgan Stanley. *See* Transcript of June 10, 1998 hearing at 99–104. In a letter dated June 16, 1998, UCC complied with this request, identifying the misrepresentations addressed in this Opinion and pointing to evidence allegedly showing that they were fraudulently made. On Wednesday, June 24, 1998, I asked my clerk to call the parties to clarify their positions on two of the issues raised in that letter. Purportedly in response to that conversation, UCC faxed chambers a seven page, single-

spaced letter on June 27, identifying further evidence in support of its theory that SOC's claim to exclusive rights to MSR was fraudulent. The vast majority of this correspondence is totally unresponsive to any request for information made by the Court or by my clerk. Therefore, the new arguments it raises will not be considered in this Opinion.

4. The testimony of the UCC employee would, presumably, have been more easily obtained by UCC.

#### 4. SOC's Representations Regarding its Future Rights to Raise Catalyst Prices

 Finally, UCC contends that SOC's representations to Morgan Stanley regarding the propriety of its 1995 catalyst price increases, and the prospects for future increases, were knowingly false. SOC does not dispute that there is evidence from which a juror could find that its catalyst manufacturing costs had declined since the advent of MSR and were expected to drop further. *See, e.g.,* UCC TPF Exhibits, Ex. 32, 83. Nor does it claim that it was authorized by the CUA or its contracts with licensees to raise catalyst prices except in response to a cost increase. *See* SOC Letter at 8. It nevertheless maintains that its representations to Morgan Stanley were based on a good faith interpretation of those agreements: According to SOC, it was permitted to increase prices when the cost of any raw material necessary for catalyst manufacture increased, but was not obligated to lower prices in response to cost reductions. *See id.*

While one might find this interpretation self-serving, it gains some support from the contractual language at issue. The licensee contracts identified by UCC allow SOC to "increase the price of [catalyst] ... to reflect *any* increase in direct cost or variable cost...." UCC TPF Exhibits, Ex. 79 at 3 (emphasis added); *see also* UCC TPF Exhibits, Exs. 80, 81. The use of the word "any" arguably suggests that price increases are justified even when costs as a whole have declined, so long as the cost of one element of the manufacturing process has risen. Moreover, the provision just quoted appears under the heading "Price Escalation." UCC TPF Exhibits, Exs. 79–81. This adds considerable weight to SOC's position that it was not required to lower catalyst prices in response to reduced costs. As to the CUA, its

relevant provision is silent on the subject of how SOC's cost is to be calculated. *See* UCC TPF Exhibits, Ex. 1 at 44. While SOC's interpretation may not be supported by the contract, it is hardly foreclosed by it. Because SOC's position on the issue was at least colorable, a rational juror could not conclude that it was made in bad faith, absent other evidence of insincerity.[5]

#### B. Reliance

 SOC also argues that it is entitled to summary judgment because there is no evidence that UCC itself relied on SOC's alleged misrepresentations. Courts applying New York law, however, do not always require a fraud plaintiff to show direct reliance: In some circumstances, at least, the reliance of a non-party—such as Morgan Stanley here—is sufficient. *See Buxton Mfg. Co. v. Valiant Moving & Storage, Inc.,* 239 A.D.2d 452, 657 N.Y.S.2d 450, 451 (2d Dept.1997) (third party's reliance on misstatement causing injury to plaintiff can support a fraud claim); *Desser v. Schatz,* 182 A.D.2d 478, 581 N.Y.S.2d 796, 797 (1st Dept.1992) (same); *Cooper v. Weissblatt,* 154 Misc. 522, 277 N.Y.S. 709 (2d Dept.1935) (same).

This exception to the general rule is consistent with the purposes of fraud law, at least one of which is to reduce the transaction costs incurred in bargained-for exchanges. If there were no law of fraud, each party to a transaction would have a powerful incentive to lie to the other as a means of obtaining more favorable terms: Why admit that you are really selling Florida swampland when a buyer might believe that it is property in downtown Miami? In order to protect themselves, reasonable people would demand extensive proof of the accuracy of all material statements regarding the subject matter of

---

5. UCC argues that the testimony of David Durand, SOC Catalyst Product Manager, shows that SOC itself did not sincerely hold the position it took before Morgan Stanley:

Q. So is it your position that even if Shell Chemical's actual cost in manufacturing a particular catalyst did not go up, that they could increase the cost if the cost of a particular raw material had gone up in the open marketplace?
A. This could be interpreted in that manner, yes.

Q. But did you ever interpret [it] in this manner?
A. I generally did not. I tended to focus on what we actually indeed paid for—on a unit cost basis....

SOC Letter, Ex. I at 418. As SOC points out, this testimony is consistent with its position that it was allowed—though of course not required—to raise catalyst prices in response to increases in the prices of individual catalyst raw materials.

the transaction.[6] When fraud is actionable, however, this costly process is avoided: *Ex ante* verification can be dispensed with if *ex post* compensation is available.

The situation is no different where, as here, a third party effectively acts as proxy for both sides to an exchange. Again, the absence of a rule prohibiting fraud would provide both parties with a strong incentive to stretch the truth—perhaps out of hope that the appraiser will be fooled, perhaps merely out of fear that the other side will stretch the truth still further. Recognizing this incentive, each would insist that the appraiser independently verify the material representations made to it by the other.[7] The necessity for this expensive and time-consuming process is eliminated if the parties face *ex post* fraud liability for any misrepresentations they make. Thus, the fact that it is the appraiser rather than the injured party who directly relies on the alleged misstatements should not determine the existence of fraud liability. This is especially true when the victim surrenders a valuable interest—here, the opportunity to obtain injunctive relief—in reliance on the fairness of the independent appraisal process.

As SOC points out, a number of cases contain language suggesting that non-party reliance can never support a fraud claim. *See, e.g., Warren v. Forest Lawn Cemetery and Mausoleum,* 222 A.D.2d 1059, 635 N.Y.S.2d 874, 874 (4th Dept.1995) (summary judgment granted when plaintiff did not allege that he himself relied on alleged misrepresentation); *Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 38 n. 8 (S.D.N.Y.1992) ("A plaintiff has failed to state a claim for fraud when he alleges merely that the misrepresentation in question was made to or relied on by a third party."); *Shaw v. Rolex Watch, U.S.A., Inc.,* 673 F.Supp. 674, 682 (S.D.N.Y.1987) ("[A] claim for fraud will not lie when premised on the reliance of a third party.").

However, most of these decisions address situations presenting a risk of far-flung liability for inchoate or unintended injuries. *See, e.g., Kelly,* 145 F.R.D. at 38 (defendant's failure to include plaintiff's name on defendant's copyright registration or record label alleged to have "perpetrated a fraud on the copyright office or on the public"—presumably including plaintiff); *Shaw,* 673 F.Supp. at 682 (defendant allegedly made misrepresentations to the United States Customs Service in order to gain protection of law barring imports of trademarked goods by anyone other than trademark owner; plaintiff later prevented from ·importing those goods). *Peerless Mills, Inc. v. American Tel. & Tel. Co.,* 527 F.2d 445, 450 (2d Cir. 1975), is representative. Plaintiffs in that case were the parents-in-law of a securities broker who was allegedly induced to enter the defendant partnership by fraud. As a condition of his entry into the partnership, the broker was required to make a capital contribution of $100,000; to satisfy this obligation, he borrowed 2,000 shares of stock from plaintiffs. In making the loan, plaintiffs did not rely on defendant's alleged misrepresentations regarding the financial health of the partnership. Rather, they were motivated exclusively by a desire to help their son-in-law get ahead in the securities business. When defendant's financial prospects deteriorated, however, plaintiffs sued for fraud. The trial court entered a judgment for defendant, and the Second Circuit affirmed, reasoning that the plaintiffs had failed to show either that defendant had intended the alleged misrepresentations to be conveyed to them or that they had relied on those misrepresentations. *See id.* at 449–51.

In such circumstances, the efficiency-enhancing policy of fraud regulation is not implicated. Even absent a rule against fraud, the *Peerless* plaintiffs would not have de-

---

**6.** Perhaps more realistically, parties could also agree contractually not to commit fraud. This, however, would also increase transaction costs.

**7.** Suppose, for instance, that UCC knew that neither party could be liable for fraud on the basis of their representations to Morgan Stanley, and that it had some reason to suppose that SOC

was making egregious misstatements in the appraisal process—e.g., submitting falsified SPC income statements. In these circumstances, it would presumably not be willing to purchase SPC at a price set by Morgan Stanley (even with the 15% discount) without an extensive investigation into SPC's actual income.

manded verification of defendant's material misrepresentations: Their concern was getting their son-in-law a job, not with ensuring that their loan would be repaid. Protecting them from fraud would therefore not lower transaction costs, as those costs would not have been incurred in any event. *Peerless* and similar cases stand for the proposition that indirect reliance is insufficient when a plaintiff's injury is an unintended or remote consequence of a defendant's misrepresentations; i.e. when the theory of fraud presented is far removed from the usual, transactional context. As I have discussed, however, the instant case differs from the archetypal transactional situation only in that the contract price was arrived at by an independent appraiser, Morgan Stanley, rather than through direct negotiations between the parties. This distinction is insufficient to insulate SOC from fraud liability.

## IV. Conclusion

A rational juror could find that SOC's statements regarding the purportedly separate nature of the MSR and SHAC II processes were made in bad faith and therefore fraudulent. Moreover, in the circumstances of this case, UCC need not prove that it was itself deceived by those statements. SOC's motion for partial summary judgment on those issues is therefore denied. However, a rational juror could not find that SOC's statements regarding the catalyst pricing provisions of the CUA, the rights to MSR, or the propriety of catalyst price increases were made in bad faith. SOC's motion on these issues is therefore granted.