HYOSUNG AMERICA, INC. and Hyosung America, Inc. as assignee of Orkid Tex., Inc., Plaintiffs,

v.

SUMAGH TEXTILE CO., LTD., Defendant.

No. 94 Civ. 568(SAS).

United States District Court, S.D. New York.

Aug. 25, 1998.

---

Matthew Gluck, Jennifer L. Colyer, Fried, Frank, Harris, Shriver & Jacobson, New York City, NY, Harlan M. Lazarus, Lazarus & Lazarus, P.C., New York City, NY, for plaintiff.

Fredrick E. Sherman, Steven C. Bennett, Jones, Day, Reavis & Pogue, New York City, NY, for defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

On January 31, 1994, Plaintiff Hyosung America, Inc. ("Hyosung") commenced this action, asserting nine claims against defendant Sumagh Textile Co., Ltd. ("Sumagh"). Defendant, in turn, asserted conterclaims for breach of contract, quantum meruit, and unjust enrichment. On November 13, 1995, defendant moved for summary judgment against Hyosung's nine claims. In an Order dated April 19, 1996, this Court granted defendant's motion in its entirety, dismissing the Complaint. *Hyosung America, Inc. v. Sumagh Textile Co.*, 934 F.Supp. 570 (S.D.N.Y.1996) (*Hyosung I*). Defendant's counterclaims were tried to the Court on July 8 and 9, 1996, and a money judgment was entered in favor of Sumagh. *See Hyosung America, Inc. v. Sumagh Textile Co.*, 94 Civ. 568, 1996 WL 499346 (S.D.N.Y. Sept.3, 1996) (*Hyosung II*). The Court of Appeals subsequently (1) affirmed the dismissal of all but one of Hyosung's claims, reversing the dismissal of plaintiff's fraud claim and remanding that claim to this Court for further proceedings; and (2) affirmed the judgment on Sumagh's counterclaims. *See Hyosung America, Inc. v. Sumagh Textile Co.*, 137 F.3d 75 (2d Cir.1998) (*Hyosung III*). On July 1, 1998, Hyosung's fraud claim was tried to this Court on a stipulated record.[1]

## I. Findings of Fact

This dispute concerns letters of credit that were issued in connection with the sale and purchase of textile fabric. Orkid Tex, Inc. ("Orkid"), a company engaged primarily in the purchase and sale of textile goods, ordered fabric from Sumagh, a textile manufac-

---

1. Testimony from the trial of Sumagh's counterclaims was offered as evidence here. The parties have withdrawn their objections to testimony from that trial and to any deposition testimony or exhibits that have been offered here as evidence.

turer and supplier, to satisfy customer purchase orders. Hyosung was Orkid's assignee in the relevant transactions, pursuant to an agreement dated January 24, 1991, which was extended by the parties on November 16, 1992 and October 14, 1993 (the "Agreement"). Hyosung, like Orkid, is primarily a textile merchant, but also performs financier services for certain textile transactions to which it is not a party.

### A. Agreement Between Hyosung and Orkid

Under the Agreement, Orkid was responsible for finding customers who wanted to buy textile fabric, and suppliers who were able to satisfy the purchase orders. See Defendant's Exhibit ("Df.'s Ex.") B at ¶ 1.[2] Orkid would submit the customer purchase orders to Hyosung and one of Hyosung's factors for review.[3] See id. at ¶ 2. Each order was subject to full credit approval by the factor and conditioned on Hyosung's satisfaction with the terms of the transaction. See id. Once Hyosung had approved the purchase order, it would arrange to open a letter of credit for the company that Orkid had selected to supply the ordered fabric. See id. at ¶ 3.

The fabric supplier would ship the goods to New York and Hyosung would clear them through Customs and arrange for them to be shipped to the customer. See id. at ¶ 4. Hyosung would then collect payment for the goods from the customer, and would remit the payment to Orkid, minus a fixed fee for its services and any additional charges for interest on late payment or inland freight from New York. See id. at ¶¶ 6, 7. Orkid bore the full risk of loss in the event of cancellation of a customer's purchase order. See id. at ¶ 8.

### B. San Moire's Purchase Orders With Orkid

In late 1992 or early 1993, Mervyn's, a department store chain, placed an order with San Moire, Inc. ("San Moire") for garments made of fabric with a content of 65% rayon and 35% wool. See Plaintiff's Exhibit ("Pl.'s Ex.") 4 at 9. After San Moire provided Orkid with a sample of the rayon/wool fabric that it needed, it placed a series of purchase orders with Orkid for production of the fabric. See id. These orders, which correctly stated the 65% and 35% wool blend content that was necessary for San Moire to comply with Mervyn's specifications, amounted to one of Orkid's largest purchase orders ever. See Deposition of Albert Hazout, Orkid's President, dated August 10, 1995 ("Hazout Dep."), at 98.

### C. Orkid's Agreement with Sumagh

Orkid turned to Sumagh as a possible supplier of the rayon/wool fabric. In the first few months of 1993, Sumagh and Orkid exchanged numerous memoranda regarding the quality, blend, and price of the fabric Sumagh could provide. See, e.g., Df.'s Exs. I, J, K, L, M, N, O, P. In those memoranda Sumagh identified several varieties of fabric which it could produce for Orkid. Though Orkid initially insisted on fabric with a 65% rayon/35% wool fiber content, see Df.'s Ex. II, the only varieties of fabric offered by Sumagh consisted of between 70% and 85% rayon and the remainder wool. See id. The price of Sumagh's fabric increased as the wool content of the material rose. See Df.'s Exs. J, V.

On April 8, 1993, Sumagh sent Orkid samples of two fabrics accompanied by a memorandum which identified the fiber content of the samples: One was 80% rayon/20% wool, and the other was 70% rayon/30% wool. See Df.'s Ex. P. On April 30, 1993, Orkid confirmed its satisfaction with the fabrics, but did not identify which of the two samples it preferred. See Df.'s Ex. R. Following some prompting by Sumagh, Orkid faxed Sumagh a memorandum requesting production of the fabric sample that had the 70% rayon/30% wool fiber content. See Df.'s Ex. U. In a letter written that same day, Sumagh ex-

---

**2.** Though some of the exhibits introduced at this trial were also introduced at the 1996 trial of defendant's counterclaims, the exhibits were renumbered for purposes of this trial.

**3.** Hyosung used factors to perform credit checks on Orkid's customers; the factors did not provide Hyosung with financing services. See Deposition of I.B. Lee, Hyosung's Textile Manager, dated November 29, 1994 ("Lee Dep."), at 24, 29.

pressed its understanding that Orkid had ordered fabric with a 70% rayon/30% wool fiber content and stated that the price of the fabric would be determined by this fiber ratio. *See* Df.'s Ex. V.

This documentary evidence is consistent with uncontradicted deposition and trial testimony that Orkid did not order fabric with a 65% rayon/35% wool fiber content. For example, Hsiao Jung Jo ("Robert"), Sumagh's General Manager, stated in deposition testimony that the fabric which was shipped pursuant to Orkid's orders was not 35 percent wool because this was not the quality of fabric that Orkid had confirmed. *See* Deposition of Hsiao Jung Jo, dated June 20, 1995 ("Robert Dep."), at 69. Similarly, at the July 1996 trial on Sumagh's counterclaims, Chang Chu Hwa ("Sarah"), Sumagh's account manager, testified as follows:

> Q: Did you know that ... Sumagh would not be delivering 65 percent rayon, 35 percent wool goods?
>
> A: I know because our customer did not order this content of goods, this content.

Trial Transcript ("Tr.") at 55–56.

Based on this evidence, I find that Sumagh offered Orkid a variety of price and fiber content ratios and that Orkid ordered fabric with a 70% rayon/30% wool fiber content. Thus, Orkid agreed to purchase from Sumagh fabric with a wool content that differed by five percent from the fabric that San Moire had ordered from Orkid. In an attempt to conceal this inconsistency, Orkid wrote on its purchase orders that Sumagh should identify the fabric content as 65% rayon/35% wool. *See, e.g.,* Pl.'s Exs. 5, 17, 28, 36, 40.

There is no proof in the record that Orkid's instructions to Sumagh were known to Hyosung. Plaintiff did not know that Orkid had discussed various rayon/wool fiber ratios with Sumagh, nor was it told that Orkid ultimately ordered fabric with a different rayon/wool fiber ratio than San Moire had specified. *See* Lee Dep. at 53, 55–57, 134. In fact, the documents that Hyosung received from Orkid described the ordered fabric as 65% rayon/35% wool. *See, e.g.,* Pl.'s Exs. 6, 18, 29. Not until several months later, after Sumagh had drawn down numerous letters of credit, did Hyosung learn of the different fiber ratio. *See id.* at 159; Robert Dep. at 62.

### D. *The Letters of Credit*

After reviewing the San Moire purchase orders it received from Orkid, Hyosung applied to the New York branch of the Bank of Seoul (the "Bank") for letters of credit, naming Sumagh as the letter of credit beneficiary. *See* Pl.'s Exs. 2, 19, 31, 43, 66, 69, 74, 75, 78; Lee Dep. at 64. Hyosung specified in these letter of credit applications that the fabric delivered by Sumagh must have a fiber ratio of 65% rayon/35% wool. The Bank of Seoul then issued letters of credit payable to Sumagh upon the Bank's receipt of certain documents, including commercial invoices, bills of lading, packing lists, and insurance certificates, showing that Sumagh had shipped fabric with this fiber.content to New York.[4] *See* Lee Dep. at 26, 43; *see, e.g.,* Pl.'s Ex. 2 at 3, 13; Df.'s Ex. XX. Without such documentation, the Bank of Seoul would not pay on the letters of credit. Once a payment was made to Sumagh, the Bank of Seoul would obtain reimbursement from Hyosung by debiting its account. *See* Pl.'s Ex. 85.

After shipping the fabric ordered by Orkid, Sumagh sought payment under the letters of credit. All of the documents that Sumagh submitted to the Bank of Seoul to draw down the letters of credit falsely indicated that the fabric shipped by Sumagh had a 65% rayon/35% wool fiber content.[5] *See, e.g.,* Pl.'s Exs. 10–16, 21, 22, 24–28, 32–37, 39, 45, 44, 47–64, 79, 85. Sumagh,was cognizant of the

---

4. The Bank of Seoul used CitiBank in Taipai, Taiwan as an advising bank. As such, CitiBank notified Sumagh when a letter of credit had issued or had been amended. *See* Df.'s Exs. XX, YY, ZZ, AAA.

5. On numerous occasions, Sumagh sold the required documentation to a negotiating bank, the Chang Hwa Commercial Bank in Taipei, Taiwan.

This bank then submitted the documents to the Bank of Seoul and obtained payment on the letters of credit. *See* Samson Dep. at 68; Df.'s Exs. GGGG, NNNN. Nevertheless, Sumagh was always the party which prepared the required documentation for presentation to the Bank of Seoul.

need for exact conformity between the description of goods in the letters of credit and the description in the documents submitted to the Bank, and thus intentionally mismarked these documents for the purpose of collecting payment on the fabric that it shipped. *See* Robert Dep. at 61 ("An 1/c was already opened at that time. And since at that time I already received the 1/c, we have to receive payment. And they already obliged to pay. So the document has to be—has to correspond to the 1/c."); *id.* at 87 ("I have told the shipping company that they have to prepare the document . . . in accordance with the terms of the 1/c."); Deposition of Samson Huang, Sumagh's Chairman of the Board, dated June 21, 1995 ("Samson Dep."), at 91 ("[o]ur document was prepared according to the 1/c opened by—the terms on the 1/c opened by Hyosung."); Tr. at 55–56 ("[T]he shipping department was instructed to put—to prepare all the documents according to the terms of the 1/c."). Moreover, Orkid had specifically instructed Sumagh to indicate on all documents that the fiber content of the shipped goods was 65% rayon/35% wool, despite the fact that it had ordered fabric comprised of 70% rayon/30% wool. *See* Df.'s Exs. QQ, EEEE, FFFF; *see also Hyosung II*, 1996 WL 499346, at *10.

One important contested factual issue is whether Sumagh knew that Hyosung was the applicant on the letters of credit, and thus was liable for any draw on the credits. Defendant does not dispute that it knew Hyosung was the assignee of Orkid's purchase contracts.[6] Nevertheless, Sumagh maintains that it did not know Hyosung was involved in the letter of credit transactions until after Sumagh had been paid on the letters of credit, and defendant's witnesses testified to this effect. *See* Defendant's Trial Memorandum ("Def.'s Mem.") at 14–15, n.8; Samson Dep. at 19–20; Robert Dep. at 62. However, this testimony is belied by various documents in the trial record. For example, in a July 21, 1993 fax to Robert and Sarah at Sumagh, Orkid wrote: "Re: PO# T–1662–*Hyosung is amending the L/C,* I wl fax you the amendment tomorrow. Tks." Df.'s Ex. KKK (spell-

ing and grammar in original) (emphasis added). Another fax from Orkid to Robert and Sarah, dated August 26, 1993, provides: "Re: PO# 1736 Rayon Wool: *Hyosung will open the L/C on Monday* without fail pls ship these goods out this weekend by boat and advise vessel info." Df.'s Ex. RRR (emphasis added). These and other written communications between Orkid and Sumagh, *see, e.g.,* Declaration of Harlan M. Lazarus, Hyosung's counsel, dated November 1, 1995, Ex. 9, reveal that at the time Sumagh prepared the false documents, it knew that Hyosung was the applicant of the letters of credit and that Hyosung would be directly injured by any fraudulent draw on the credits.

### E. *The San Moire Deal Goes Bad*

In June 1993, Orkid made the first delivery of fabric to San Moire, which San Moire accepted. San Moire, in turn, sent sample garments to Mervyn's, to which Mervyn's did not object. In a memorandum to Sumagh dated July 27, 1993, Orkid confirmed that it was satisfied with the quality of rayon/wool fabric that Sumagh had been shipping, noting: "We don't care wear [sic] you get the . . . goods from as long as its the same quality that you [sic] been shipping." *See* Df.'s Ex. Y.

But the deal soon soured. On September 30, 1993, San Moire sent a letter to Hyosung and Orkid, which stated: "There is a problem with the content of the Rayon Wool goods purchased. All payments of invoices for the Rayon Wool fabrics will not be paid until the problem is resolved." Df.'s Ex. Z. On October 4, 1993, Mervyn's sent a letter to San Moire, in which it rejected "the entire shipment of rayon/wool merchandise" sent by San Moire. Df.'s Ex. AA. Mervyn's stated that it was rejecting the goods because "[t]he actual fabric content of the merchandise delivered to Mervyn's was 76.6% rayon and 23.4% wool," though "Mervyn's purchase order required that the fabric content of the merchandise be 65% rayon and 35% wool." *Id.* Several other fiber content analyses produced similar results—none showing more

---

6. In fact, Sumagh identified Hyosung as the purchaser of the fabric on every document that it submitted to draw down the letters of credit.

*See, e.g.,* Pl.'s Exs. 10–15, 24–26, 31, 33, 34, 52, 54, 55, 57–62.

than 25% wool content. *See* Pl.'s Exs. 49–51; Df.'s Exs. NN, QQ. Although San Moire never returned any of the rayon/wool fabric, it refused to pay Hyosung for some of the material.

## II. Discussion

Hyosung claims that it was defrauded by Sumagh's presentation of documents to the Bank of Seoul which falsely represented that the fabric supplied by defendant had a fiber content of 65% rayon/35% wool. For, if Sumagh had not presented this false documentation, the Bank of Seoul would not have drawn down the letters of credit on which Hyosung was liable. Plaintiff seeks to recover the amount that Sumagh collected from the letters of credit that were issued to finance the relevant Orkid purchase orders,[7] less the amount that plaintiff was paid by San Moire for the non-conforming fabric.

### A. *Whether Hyosung's Fraud Claim Is Precluded by Its Contractual Relationship With Sumagh*

■ Sumagh argues that plaintiff's fraud claim must fail because misrepresentations concerning the performance of a contract cannot establish a cause of action for fraud. *See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996). This principle is inapplicable to the facts of this case. Plaintiff's fraud claim concerns the misrepresentations made by Sumagh in drawing down the letters of credit, not the purchase order contracts that were assigned by Orkid to Hyosung. Letters of credit involve three separate, but related relationships: (1) the underlying sales contract between a buyer (here, Orkid originally, then Hyosung as its assignee) and seller (Sumagh); (2) the agreement between the issuing bank (Bank of Seoul) and the applicant (Hyosung); and (3) the letter of credit itself, which is the Bank's promise to pay the seller-beneficiary (Sumagh) upon compliance with the terms and conditions specified in the letter of credit. *See Alaska Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813,

815 (2d Cir.1992); *All Service Exportacao, Importacao Comercio S.A. v. Banco Bamerindus Do Brazil, S.A., New York Branch*, 921 F.2d 32, 34 (2d Cir.1990); *Mennen v. J.P. Morgan & Co.*, 91 N.Y.2d 13, 666 N.Y.S.2d 975, 979, 689 N.E.2d 869 (1997); *First Commercial Bank v. Gotham Originals, Inc.*, 64 N.Y.2d 287, 486 N.Y.S.2d 715, 718, 475 N.E.2d 1255 (1985). In *Alaska Textile*, the court instructed that the utility of a letter of credit depends on the independence of these three relationships:

> The fundamental principle governing documentary letters of credit and the characteristic which gives them their international commercial utility and efficacy is that the obligation of the issuing bank to honour a draft on a credit when it is accompanied by documents which appear on their face to be in accordance with the terms and conditions of the credit is independent of the performance of the underlying contract for which the credit was issued.

982 F.2d at 815. Accordingly, the plaintiff's claim for fraud on the letters of credit concerns a transaction that is separate and distinct from the Orkid–Sumagh contracts which were assigned to Hyosung. Plaintiff's fraud claim, therefore, is not barred by its contractual relationship with Sumagh.

### B. *Elements of Common Law Fraud*

Under New York law, "the essential elements of a common law fraud claim include a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Hyosung III*, 137 F.3d at 77 (quoting *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir.1994)) (internal quotations omitted). Each element is discussed in turn.

#### 1. *Reliance on False Representations*

As noted above, Sumagh did not believe that the fabric which it was shipping had a fiber content of 65% rayon/35% wool. Nevertheless, in the documents that Sumagh prepared for submission to the Bank of Seoul, it

---

**7.** The purchase orders are numbered T–1660, T–1662, T–1683, T–1685, T–1704, T–1736 and T–1737.

represented that the fabric had this fiber ratio. If defendant had not falsified these documents, the Bank of Seoul would not have paid out on the letters of credit. I therefore conclude that Sumagh made a false representation on which the Bank of Seoul relied, resulting in payments on the letters of credit.

However, the plaintiff here is not the Bank of Seoul, but Hyosung. Plaintiff was not the recipient of those misrepresentations. The threshold question, then, is whether plaintiff can successfully assert a fraud claim when Sumagh's misrepresentations were made to the Bank of Seoul.

### a. Third Party Reliance Under New York Law

Several cases have held that a claim for fraud cannot lie where the misrepresentation is made to and relied upon by a third party, rather than the plaintiff. *See, e.g., Peerless Mills, Inc. v. American Tel. & Tel. Co.*, 527 F.2d 445, 450 (2d Cir.1975); *Shaw v. Rolex Watch, U.S.A. Inc.*, 673 F.Supp. 674, 682 (S.D.N.Y.1987); *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 38 n. 8 (S.D.N.Y.1992), *aff'd*, 23 F.3d 398 (2d Cir.1994).[8] On the other hand, courts have accepted that even where misrepresentations are made to a third party, a plaintiff may state a claim for fraud so long as it relied on those misrepresentations. *See, e.g., Rosen v. Spanierman*, 894 F.2d 28, 33 (2d Cir.1990) ("third party can recover damages for a fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that the defendants in-

tended the misrepresentation to be conveyed to him"); *cf. Cement and Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196, 1998 WL 354388, at *4 (2d Cir.1998) (denying recovery because plaintiff failed to prove that it relied on misrepresentations which were made to a third party).

Moreover, New York courts have recently held that a plaintiff may state a claim for fraud where a defendant's misrepresentation caused a third party to extinguish its financial obligation to the plaintiff. *See, e.g., Buxton Mfg. Co. v. Valiant Moving & Storage, Inc.*, 239 A.D.2d 452, 657 N.Y.S.2d 450 (2d Dep't 1997); *Desser v. Schatz*, 182 A.D.2d 478, 581 N.Y.S.2d 796 (1st Dep't 1992). The plaintiff in *Buxton* sold certain heat exchange machines to the defendant contractor, who had been hired by the U.S. Department of Agriculture ("U.S.D.A.") to install the machines at one of its facilities. Defendant allegedly submitted a payment certificate for the project to the U.S.D.A., representing that all its suppliers had been paid, though, in fact, plaintiff had not been fully paid. Plaintiff alleged that had defendant not submitted the false payment certificate, the U.S.D.A. would have withheld from defendant an amount sufficient to pay plaintiff's outstanding claims. The court held that plaintiff's allegations satisfied the requirements of common law fraud, though the alleged false representation was made to a third party.[9]

In *Desser*, plaintiff was the executrix of the estate of an individual, Arthur Desser, who

---

8. As this Court has recently noted, "most of these decisions address situations presenting a risk of far-flung liability for inchoate or unintended injuries." *Union Carbide Corp. v. Montell N.V.*, 9 F.Supp.2d 405, 412, 1998 WL 378136, at *6 (S.D.N.Y.1998). *See, e.g., Peerless*, 527 F.2d at 449–50 (plaintiff loaned money to his son-in-law, a securities broker, who was allegedly induced by fraud to invest the money in a partnership with deteriorating financial prospects); *Kelly*, 145 F.R.D. at 38 (defendant's failure to include plaintiff's name on defendant's copyright registration or record label was alleged to have "perpetrated a fraud on the copyright office or on the public," which presumably included plaintiff); *Shaw*, 673 F.Supp. at 682 (defendant allegedly made misrepresentations to the U.S. Customs Service in order to gain protection of law barring imports of trademarked goods by anyone other than trademark owner; plaintiff was later prevented from importing those goods).

9. In a recent decision, the Second Circuit reached a contrary conclusion. In *Lollo*, 148 F.3d 194, 1998 WL 354388, the district court found, following a bench trial, that defendant had conspired to defraud various pension funds of contributions by falsely representing to two general contractors that the defendant's company had complied with its obligations to make contributions to the pension funds. As a result of these misrepresentations, the general contractors did not withhold money to cover the unpaid contributions. Because there was no evidence that plaintiffs, rather than the general contractors, had relied on defendant's misrepresentations, the Court of Appeals reversed, holding that "a plaintiff does not establish the reliance element of fraud for purposes of ERISA or New York law by showing only that a third party relied on a defendant's false statement." *Id.* at 196, 1998 WL at *3. However, unlike the present case, defendant's misrepresentations in *Lollo* were not the immediate cause of plaintiffs' loss. While the union members in *Lollo* may have

had loaned money to defendants in exchange for a purchase money mortgage on a hotel. Desser had assigned his interest in the mortgage to a bank as collateral for an unrelated personal loan. After Desser had paid off the personal loan, but before he could foreclose on the mortgage, defendants falsely represented to the bank that the mortgage had been paid in full, thus inducing the bank to wrongfully extinguish plaintiff's interest in the mortgage. The court concluded that "[r]eliance by [the bank], to the clear detriment of plaintiff, is manifest, and it is of no moment, in this context, that the false representation was not made directly to plaintiff." *Desser*, 581 N.Y.S.2d at 797. In both *Buxton* and *Desser*, the immediate consequence of the fraud was to deprive the plaintiff of a property interest that was within the control of a third party.

■ In the case at bar, Hyosung was liable to the Bank of Seoul for any amount that Sumagh drew on the letters of credit. The Bank's role was that of a financial intermediary, and the party at risk in the letter of credit transaction was Hyosung. *See Emery–Waterhouse Co. v. Rhode Island Hosp. Trust Nat'l Bank*, 757 F.2d 399, 406 (1st

Cir.1985) (Breyer, J.) (letter of credit applicant may state a claim for conversion against party drawing down letter of credit using fraudulent documents; though issuing bank paid on letter of credit with its own funds, court recognized that in a letter of credit transaction, the applicant's money, not the bank's, is "at stake throughout"). The harm to Hyosung was immediate and definite: By drawing on the letters of credit, Sumagh imposed on Hyosung a new obligation to the Bank. Additionally, when Hyosung applied for the letters of credit, it was aware that the Bank was required to make immediate payments on its behalf, based solely on the representations made in the required documents. Thus, I find that when Hyosung opened and amended the letters of credit, it anticipatorily relied on Sumagh's submissions to the Bank. Under these circumstances, Hyosung has satisfied the reliance element of fraud, although the fraudulent documents were submitted to the Bank rather than to Hyosung.[10]

### b. *Reliance and Letter of Credit Principles*

■ This result is consistent with the established law governing letter of credit trans-

---

performed their work with the expectation of receiving pension fund contributions from their employer, they apparently did not act in reliance on the general contractor's obligation to withhold payments for the employer's unpaid contributions. Irrespective of defendant's misrepresentation to the general contractor, the employer was obligated to make contributions to the pension funds, and it was this non-payment—not defendant's misrepresentations—which was the source of plaintiffs' injury. By contrast, Hyosung was obligated to reimburse the Bank of Seoul upon its receipt of conforming documents and payment on the letters of credit, even if the submitted documents were fraudulent. Hyosung agreed to be bound by the Bank's payment on the credits because it believed that Sumagh would submit accurate documents. In this respect, Hyosung relied, in advance, on the accuracy of Sumagh's representations when it opened the letters of credit. Moreover, it should be noted that in deciding this issue of New York law, the court in *Lollo* relied upon several factually distinguishable Appellate Division decisions and did not mention *Buxton*, which concerned nearly identical facts.

**10.** Furthermore, one purpose of fraud actions is "to reduce the transaction costs incurred in bar-

gained-for exchanges." *Union Carbide*, 9 F.Supp.2d 405, 411, 1998 WL 378136, at *6. When fraud is actionable, the costly process of verifying the accuracy of another's representations is avoided, for "[e]x ante verification can be dispensed with if *ex post* compensation is available." *Id.* It is plain that in letter of credit transactions, an applicant would impose a stringent verification requirement if it could not recover against a beneficiary for fraud. The applicant would require that the beneficiary present the issuing bank with a certificate of inspection from a trustworthy entity—a requirement that would unnecessarily complicate the letter of credit process. The facts of the instant case are instructive on this point. After San Moire complained about the fabric fiber content, Hyosung included an inspection requirement in the terms of the letters of credit. Sumagh initially refused to accept the letters of credit with the inspection clause; it later consented only to inspection in Taiwan, not in the United States, because it was concerned with the possibility of incurring an extra freight charge if the goods were returned following inspection overseas. *See* Df.'s Exs. DDDD, EEEE, FFFF. A rule permitting recovery by the letter of credit applicant would reduce the need for verification and the attendant transaction costs.

actions. The doctrine of independent ·contracts, discussed above, seeks to ensure that the issuing bank will promptly pay on letters of credit. However, once the issuer has paid on the letter of credit, the independent contract doctrine's purpose is satisfied; it cannot be invoked as a bar to recovery against a beneficiary who submitted false documents to draw down on the letter of credit. *See Mennen,* 666 N.Y.S.2d at 980, 689 N.E.2d 869; *see also Mellon Bank, N.A. v. Gen. Elec. Credit Corp.,* 724 F.Supp. 360, 365 (W.D.Pa. 1989) ("[T]he [independence doctrine's] purpose is not to prevent any subsequent challenge to the validity of the beneficiary's claim, but to ensure that 'contractual disputes wend their way towards resolution with money in the beneficiary's pocket rather than in the pocket of the contracting party.'") (quoting *Itek Corp. v. First Nat'l Bank of Boston,* 730 F.2d 19, 24 (1st Cir.1984)).

■ There is a limited exception to the independence doctrine's pay-first, sue-later rule which recognizes the immediacy of the applicant's interest in the letter of credit relationship between the issuing bank and the beneficiary. This exception, which has been codified in N.Y.U.C.C. § 5–114, provides that an applicant may enjoin an issuing bank from paying on the letter of credit if the beneficiary has submitted false documents or if there is fraud in the underlying sales transaction, unless the demand for payment is made by a holder in due course. *See Rockwell Int'l Systems, Inc. v. Citibank, N.A.,* 719 F.2d 583, 588 (2d Cir.1983); *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 392 N.Y.S.2d 265, 270–71, 360 N.E.2d 943 (1976); *Takeo Co. v. Mead Paper, Inc.,* 204 A.D.2d 123, 611 N.Y.S.2d 543, 545 (1st Dep't 1994).[11] An applicant claiming fraud can thus enjoin a

bank's payment on a letter of credit—despite the strong policy opposing such "prior restraint." In light of an applicant's standing to enjoin payment based on fraud, it would be anomalous to prevent an applicant from asserting a fraud claim against the beneficiary *after* the letters of credit had been drawn down and its account has been debited. Accordingly, in order to recover for fraud, Hyosung need not prove that it, rather than the Bank of Seoul, received Sumagh's misrepresentations.[12] *Accord Holmberg v. Morrisette,* 800 F.2d 205, 211 (8th Cir.1986) (affirming judgment for letter of credit applicant on fraud claim against beneficiary, applying Minnesota law).

### c. Whether Access to Information Precludes Reliance

Defendant nevertheless contends that plaintiff was not defrauded because it should have known that the goods being shipped were not 65% rayon/35% wool. Specifically, Sumagh argues that Hyosung would have been aware of the deception if it had (1) reviewed the correspondence between Orkid and Sumagh; (2) required that Sumagh obtain inspection certificates before drawing down the letters of credit; or (3) inspected the fabric itself.

■ The principle that a fraud claim must fail where the plaintiff "enjoy[s] access to critical information but fail[s] to take advantage of that access," is more relevant in cases that involve the purchase of a business, where the party is always on notice of the need for conducting due diligence. *See Hyosung III,* 137 F.3d at 78–79. Where, as here, the parties are engaged in a commonplace commercial transaction, plaintiff's failure to review readily accessible information will not

---

11. The letters of credit at issue here are governed by the Uniform Customs and Practice for Commercial Documentary Credits ("UCP"). *See, e.g.,* Pl.'s Ex. 2 at 6; Df.'s Ex. XX. As a result, Article 5 of the U.C.C. is inapplicable. *See* N.Y.U.C.C. § 5–102(4). Nevertheless, this limited exception to the independence doctrine applies to the instant letters of credit, as the exception is of common law origin and does not conflict with the UCP. *See Rockwell,* 719 F.2d at 588; *Cambridge Sporting,* 392 N.Y.S.2d at 269, n. 2, 360 N.E.2d 943.

12. In *Fertico Belgium S.A. v. Phosphate Chems. Export Ass'n, Inc.,* 100 A.D.2d 165, 473 N.Y.S.2d 403 (1st Dep't 1984), a letter of credit applicant asserted claims for fraud and conversion, alleging that the beneficiary had made certain misrepresentations in documents it had submitted to draw down the credit. The court held that plaintiff's claims were "fatally deficient," reasoning that "[the applicant] was not a party to the letter of credit and had no rights thereunder." *Id.* at 409. For the reasons set forth above, this rationale is not persuasive and I decline to follow it.

defeat its fraud claim unless it was "placed on guard or practically faced with the facts" of the fraud. *Id.* at 79.

Every document that Hyosung received from Orkid concerning the orders it had placed with Sumagh identified the fabric as 65% rayon/35% wool. Nevertheless, defendant argue that Hyosung was placed on notice by a memorandum which it received from Orkid on May 14, 1993, before the first shipment of fabric was made. The notice states, in part, as follows:

> Lately Orkid Tex, Inc. is facing a lot of claims and cancellations from our customers, because of U.S. customs, who is refusing the release of merchandise, which are wrongly marked on documents. Such as: full description of the goods, wrong visa, wrong conversion to sq/m, cartons and tags wrongly marked, and not matching documents etc....

Df.'s Ex. RR. This document simply warns that some of Orkid's suppliers had not followed the required procedures for passing goods through U.S. Customs. The customer complaints referred to in the memorandum plainly concern the customer's *delay* in receiving the goods, not the *quality* of the goods ultimately received; nor does the memorandum suggest that *Sumagh* supplied any of the delayed shipments. Thus, Hyosung was not "placed on guard or practically faced with the fact[ ]" that Sumagh was falsifying the many documents which were required to draw down the letters of credit. I therefore find that plaintiff was not on sufficient notice of defendant's misrepresentations to require that it take the investigative or precautionary steps suggested by defendant.

In summary, I conclude that plaintiff has satisfied the element of reliance because it anticipatorily relied on Sumagh's submissions to the Bank of Seoul and was not on notice of the misrepresentations.

### 2. Materiality of the Misrepresentations

■ I further find that Sumagh's misrepresentations concerning the fabric's fiber content were material. For, as I concluded above, the Bank of Seoul would not have paid on any of the letters of credit if Sumagh had indicated that the shipped fabric was 70% rayon/30% wool.[13] Moreover, based on Orkid's efforts to conceal the fact that it had ordered fabric with a 70% rayon/30% wool fiber content, I conclude that a five percent discrepancy in fabric content was also material to the underlying sales transaction. *Cf.* Df.'s Exs. AA, II.

### 3. Intent to Defraud

■ The last element which plaintiff must prove is intent to defraud. I have already found that Sumagh knowingly submitted false documents to the Bank of Seoul for the express purpose of obtaining payment on the letters of credit, understanding that it was entitled to draw down the credits only if the documents perfectly matched the terms of the credits. I have also concluded that Sumagh knew Hyosung would be liable on the letters of credit. In light of these facts, I find that Sumagh intended to defraud Hyosung. Because Hyosung has proven all the elements of fraud, I find for plaintiff on the issue of liability.

### C. Damages

Based on the documentary evidence presented at trial, I find that Sumagh, directly or through a negotiating bank, drew down $491,133.81 from the letters of credit opened by Hyosung.[14] *See* Pl.'s Ex. 85. Hyosung concedes that Sumagh is entitled to a credit for $155,000, which plaintiff received pursu-

---

**13.** Though it was later discovered through laboratory analysis that the fabric had only a 20 to 25% wool fiber content, none of the evidence presented at trial suggests that defendant knew this fact at the time it prepared the required documents. Based on the evidence in the trial record, I find that Sumagh believed the product it had shipped complied with Orkid's order for 70% rayon/30% wool fabric. Because Sumagh is not liable for any misdescriptions that it did not know about, *see Sherkate Sahami Khass Rapol*

*(Rapol Constr. Co.) v. Henry R. Jahn & Son, Inc.,* 701 F.2d 1049, 1052 (2d Cir.1983), the materiality of its misrepresentations must be determined based on its belief that the fabric content was 70% rayon/30% wool, not on the fabric's true fiber content.

**14.** These transactions are set forth in a table annexed as Exhibit A.

ant to a settlement agreement with San Moire. Defendant urges, however, that the measure of damages should be further reduced because (1) plaintiff settled its claim with Albert Hazout of Orkid, a joint tortfeasor; and (2) plaintiff did not reasonably mitigate its damages.

### 1. Settlement With Joint Tortfeasors

■ Pursuant to a settlement agreement dated August 1, 1995, Hyosung discontinued a state court action against Albert Hazout, Orkid's president,[15] in which Hyosung alleged the same injury as it claims here. *See* Df.'s Ex. RRRR. The only consideration received by Hyosung was Hazout's agreement to cooperate and testify as a non-party witness in this action. *See id.* Defendant contends that under Section 15–108(a) of New York's General Obligations Law, Hyosung's recovery against Sumagh must be reduced by Hazout's equitable share of Hyosung's damages. That section provides as follows:

> When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, ... it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, *but it reduces the claim of the releasor against the other tortfeasors* to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, *or in the amount of the tortfeasor's equitable share of the damages* under article fourteen of the civil practice law and rules, *whichever is the greatest.*

N.Y.Gen.Oblig. § 15–108(a) (emphasis added). This provision ensures that "even if the settlement amount is less than the settling tortfeasor's equitable share, the nonsettling defendants pay no more than their equitable share of the verdict." *Williams v. Niske,* 81 N.Y.2d 437, 599 N.Y.S.2d 519, 522, 615 N.E.2d 1003 (1993). A defendant carries the burden of establishing the equitable shares attributable to a settling tortfeasor when seeking to reduce its own responsibility for damages. *See In re Joint Southern and Eastern Dist. Asbestos Litig.,* 741 F.Supp. 50, 51, n. 2 (E.D.N.Y.1990); *Bigelow v. Acands, Inc.,* 196 A.D.2d 436, 601 N.Y.S.2d 478, 480 (1st Dep't 1993).

■ Because Hyosung received no monetary consideration in exchange for Hazout's release, any reduction in Hyosung's damages pursuant to § 15–108(a) must be measured by Hazout's equitable share of plaintiff's damages. The record, however, is devoid of any evidence that Hazout was aware of or had any role in the fraud perpetrated on Hyosung. According to Hazout's deposition testimony, he was not involved in obtaining purchase orders or assigning them to Hyosung, nor did he otherwise participate in the day-to-day management of Orkid. *See* Hazout Dep. at 14, 17. These duties were performed by Lloyd Kohler, Orkid's vice-president until December 1993 (when the company ceased operating), and Jo Amar, Orkid's Secretary until June 1993. *Id.* at 5–6, 14, 16. Though Hazout was aware that Orkid had ordered "polywool" fabric from Sumagh, he did not review the purchase orders and did not know the fiber content that had been ordered. *Id.* at 23–24, 27. There is nothing in the record to contradict Hazout's account: None of the many memoranda exchanged by Orkid and Sumagh bear his name; rather, the documents clearly show that Amar and Kohler were the two individuals involved in the selection of fabric quality. *See, e.g.,* Df.'s Exs. P, U, Y. Accordingly, though Orkid, Amar, and Kohler were all participants in the fraud on Hyosung, Sumagh has not proven that Hazout was also involved. Therefore, Hyosung's settlement with Hazout does not reduce plaintiff's recovery against Sumagh in this action.

### 2. Mitigation of Damages

■ The victim of a tort may not recover damages that could have been avoided by its reasonable efforts. *See Federal Ins. Co. v. Sabine Towing & Transp.,* 783 F.2d 347, 350 (2d Cir.1986); *Lund v. Chemical*

---

**15.** In June 1993, Hazout became Orkid's sole shareholder. Before that time, he, Jo Amar, and Lloyd Kohler, each owned one-third of the company. *See* Hazout Dep. at 4–5, 58–59.

*Bank,* 797 F.Supp. 259, 271 (S.D.N.Y.1992); Restatement (Second) of Torts § 918. As Judge Friendly has explained, "the community's notions of fair compensation to an injured plaintiff do not include wounds which in a practical sense are self-inflicted." *Ellerman Lines, Ltd. v. President Harding,* 288 F.2d 288, 290 (2d Cir.1961). The burden of showing that a plaintiff unreasonably failed to mitigate damages rests with the wrongdoer. *Sabine,* 783 F.2d at 350; *Cornell v. T.V. Development Corp.,* 17 N.Y.2d 69, 268 N.Y.S.2d 29, 215 N.E.2d 349 (1966); *Golbar Properties, Inc. v. North American Mortgage Investors,* 78 A.D.2d 504, 431 N.Y.S.2d 820 (1st Dep't 1980).

### a. *Recovery Against Orkid*

 Defendant argues first that Hyosung should have mitigated its damages by recovering against Orkid, which directed Sumagh to mislabel the goods. In November 1994, Hyosung commenced an action against Orkid in New York State Supreme Court and moved for a default judgment when Orkid failed to appear. *See* Df.'s Exs. DD, SSSS. The motion was denied in June 1995 because Hyosung had not provided an affidavit of service on Orkid. *See* Df.'s Ex. SSSS. Defendant contends that Hyosung's failure to correct this procedural error was an unreasonable failure to mitigate damages. This argument misapprehends the nature of the mitigation requirement. While a party must reasonably mitigate its damages, it need not seek recovery from each tortfeasor. Hyosung may proceed against "any or all" of the participants in the letter of credit fraud, each of which is jointly and severally liable for its injuries. *See Hecht v. City of New York,* 60 N.Y.2d 57, 467 N.Y.S.2d 187, 190, 454 N.E.2d 527 (1983). Hyosung is thus entitled to seek recovery from Sumagh alone.[16]

### b. *Recovery Against San Moire*

 Second, Sumagh contends that Hyosung should have obtained more than $155,-000 in compensation from San Moire. Hyosung commenced an action in October 1994 against San Moire for payment on the non-conforming rayon/wool fabric that it had received from Hyosung. *See* Df.'s Ex. BB. In December 1994, Hyosung settled this claim for $180,000, one-third of the amount sought in its complaint. *See* Df.'s Exs. BB at 3, CC. Hyosung agreed to accept payments from San Moire in installments. *See* Df.'s Ex. CC ($100,000 plus eight "equal monthly installments" of $10,000 each). Before Hyosung could collect the full amount on its settlement, San Moire transferred all its assets to a new corporation. *See* Df.'s Ex. SSSSS. In order to avoid "the expense of further litigation and the possibility of a bankruptcy filing," Hyosung agreed to accept only $25,000 on the outstanding judgment of $50,000 against San Moire. *See id.* As a result, Hyosung collected only $155,000 from San Moire, not the $180,000 agreed to in the December 1994 settlement agreement. Sumagh now argues (1) that Hyosung should not have settled with San Moire for as little as $180,000, and (2) that Hyosung was at fault for not collecting the full $180,000, because it "permitted San Moire to slide to the edge of bankruptcy before it collected its (by then inadequate) compensation." Def.'s Mem. at 27, n. 19.

Plaintiff's injury resulted from San Moire's refusal to pay for the non-conforming rayon/wool fabric manufactured by Sumagh. Thus, by reaching a settlement with San Moire in December 1994, and later agreeing to a reduction of the settlement amount to avoid the possibility of bankruptcy, Hyosung reduced its damages by $155,000. Sumagh is correct that Hyosung would have further limited its damages if it could have obtained a greater payment from San Moire. But, Sumagh has altogether failed to show that Hyosung's conduct in settling its claims was unreasonable. I therefore find that Hyosung did not fail in its duty to mitigate its damages.

---

**16.** Moreover, Sumagh has not proven that Hyosung's failure to obtain a default judgment against Orkid was unreasonable. By Sumagh's own account, Orkid has been out of business since December 1993. *See* Def.'s Mem. at 31–32; *accord* Hazout Dep. at 58–59. If, in fact, Orkid still owns any assets, then Sumagh may proceed against the company, as well as against any other non-settling joint tortfeasors, in an action for contribution. *See* N.Y.C.P.L.R. §§ 1401, 1403; *Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 583 N.Y.S.2d 957, 964, 593 N.E.2d 1365 (1992).

#### c. *Recovery Against Hyosung's Factors*

 The last of defendant's mitigation arguments that warrants discussion concerns Hyosung's factors. Defendant asserts that "Hyosung had contractual arrangements with factoring companies, which guaranteed that San Moire would pay for its purchases," Def.'s Mem. at 28, and that Hyosung unreasonably chose not to enforce those guarantees. The evidence in the record does not support Sumagh's contention that Hyosung's factors had agreed to insure it against the risk that San Moire would refuse to pay for *non-conforming goods. See, e.g.,* Lee Dep. at 22–25. Moreover, even assuming, *arguendo,* that Hyosung's factors had provided such a guarantee, the duty to mitigate would not require plaintiff to pursue its rights against them. For, it is plain that the duty to mitigate does not impose on a plaintiff a duty to obtain compensation from its insurers, rather than from the tortious wrongdoer which caused its injures. Seeking redress from its factors would merely determine which party would compensate Hyosung for its injuries; it would not mitigate the extent of those injuries. I therefore find that plaintiff has not unreasonably failed to mitigate its damages.

#### 3. *Prejudgment Interest*

 Plaintiff is entitled to prejudgment interest at the statutory rate of nine percent, calculated on a simple interest basis from the earliest ascertainable date on which its cause of action existed. *See* N.Y.C.P.L.R. § 5001, 5004; *Marfia v. T.C. Ziraat Bankasi,* 147 F.3d 83, 1998 WL 286043 (2d Cir.1998); *Farrell v. Comstock Group, Inc.,* 211 A.D.2d 493, 621 N.Y.S.2d 325, 326 (1st Dep't 1995). Where, as here, the damages were incurred at various times, interest may be computed for each injury from the date on which it was incurred. *See* N.Y.C.P.L.R. § 5001(b). Hyosung's award of pre-judgment interest for each of Sumagh's draws on the letters of credit is thus computed from the date on which Sumagh made the draws.[17] Hyosung is therefore entitled to $148,051.35 in prejudgment interest.

### III. Conclusion

It is unfortunate that Sumagh bears the entire burden of compensating Hyosung for its damages. Orkid was the principal wrongdoer, as it directed Sumagh to mislabel the fabric and the related documents. Sumagh submitted the false documents in an effort to obtain payment for the goods that it had shipped. Indeed, the price that Sumagh charged Orkid—and thus the amount by which Sumagh drew down the letters of credit—was for fabric with a 30% wool content, not the more expensive 35% wool fabric. Nevertheless, if letter of credit applicants and issuing banks are to rely on the accuracy of the submitted documents, then the knowing presentation of false documents cannot be tolerated. Upon learning that letters of credit had been opened only for fabric with a 65% rayon/35% wool fiber content, Sumagh should have required that the credits be amended to cover fabric containing 70% rayon/30% wool, rather than falsifying the many documents, including insurance certificates, export papers, and bills of lading, that were submitted to the Bank of Seoul.[18]

For the reasons set forth above, Sumagh is liable for fraud in the amount of $336,133.81 and $148,051.35 in prejudgment interest (for a total of $484,185.16). As all outstanding issues are now decided, the Clerk is directed to close this case after a judgment is entered.

SO ORDERED.

*Exhibit A*

| Invoice Date | Advice Date[†] | Purchase Order Number | Amount Debited | Interest Amount[*] |
|---|---|---|---|---|
| 6/18/93 | 7/14/93 | T–1685 | $ 11,024.23 | $ 0.00 |
| 6/06/93 | 8/3/93 | T–1683 | $ 27,443.90 | $ 0.00 |

17. This computation is set forth in Exhibit A.

18. Moreover, there is no proof in the record that Orkid's instructions to Sumagh were known to Hyosung.

| | | | | |
|---|---|---|---|---|
| 7/12/93 | 8/3/93 | T–1683 | $ 55,567.95 | $ 0.00 |
| 7/19/93 | 8/12/93 | T–1683 | $ 48,800.00 | $ 0.00 |
| 7/22/93 | 8/12/93 | T–1683 | $ 17,476.50 | $ 2,406.37 |
| 7/27/93 | 8/12/93 | T–1662 | $ 30,483.85 | $ 13,815.45 |
| 8/02/93 | 8/20/93 | T–1685 | $ 55,076.15 | $ 24,852.17 |
| 8/02/93 | 8/17/93 | T–1683 | $ 17,795.55 | $ 8,043.10 |
| 8/09/93 | 3/24/94 | T–1736 | $ 46,314.25 | $ 18,431.80 |
| 8/10/93 | 8/26/93 | T–1662 | $ 9,228.70 | $ 4,150.64 |
| 8/10/93 | 8/26/93 | T–1704 | $ 41,133.90 | $ 18,500.11 |
| 8/10/93 | 8/26/93 | T–1685 | $ 6,472.80 | $ 2,911.16 |
| 9/06/93 | 9/14/93 | T–1736 | $ 55,795.18 | $ 24,832.68 |
| 9/07/93 | 10/07/93 †† | T–1737 | $ 68,520.85 | $ 30,107.87 |
| **TOTAL** | | | **$491,133.81** | **$148,051.35** |

† The advice date is the date on which the Bank of Seoul informed Hyosung that Sumagh had made a draw on the letters of credit and Hyosung's account had been debited. *See* Pl.'s Ex. 85.

†† The advice date for this draw is not legible on the relevant document. *See* Pl.'s Ex. 85. I have estimated this date based on the invoice dates and advice dates of the other draws.

\* Because Hyosung received a $155,000 payment from San Moire, plaintiff cannot recover interest on the first $155,000 debited from its account.